**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **QUENTIN BULLOCK, and JACK REID,** **individually and on behalf of a** **class,** | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 04 C 1051 |
| v. | ) ) | |
| **MICHAEL SHEAHAN, SHERIFF OF COOK** **COUNTY, in his official capacity,** **and COOK COUNTY,** | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Quentin Bullock and Jack Reid, individually and on behalf of a class (collectively "plaintiffs") have brought this suit challenging the constitutionality of defendants Michael Sheahan and Cook County's (collectively "defendants") policy and/or practice under which male inmates, in the custody of the Cook County Department of Corrections ("CCDC"), were subjected to strip searches upon returning to the CCDC for out-processing after being ordered released. The parties have filed cross motions for summary judgment. For the following reasons, plaintiffs' motion is granted in part and defendants' motion is denied.

I.

Plaintiffs' amended complaint alleges violations of the Fourth and Fourteenth Amendments of the U.S. Constitution based on the defendants' policy and/or practice under which male inmates were

subjected to strip searches upon returning to the CCDC for out-processing after being ordered released. Specifically, at the time they were strip searched, plaintiffs Bullock and Reid had been ordered released after being found not guilty of the charges against them.

The following facts are not in dispute. All CCDC inmates, including those ordered discharged in court, are required to return to the jail before being released. All inmates returning to the jail after their court appearances (hereinafter "returns") are placed in holding cells located within the Receiving, Classification and Diagnosis Center ("RCDC") of the jail prior to being brought back to their respective housing divisions within the jail. The CCDC has several housing divisions which house different groups or classifications of inmates (*i.e.* maximum, medium, minimum security). Each of these divisions has its own separate building on the jail grounds. There are two housing divisions for women. The RCDC is located in the basement of Division Five and is the nerve center of the jail for inmate transport, as all inmates who enter or exit the jail are processed at some point in the RCDC, as well as inmates who are transferred between housing divisions. The inmates are placed in bullpens within the RCDC. Aside from the smaller bullpens A, B, C, and D, the male intake area of the RCDC has six additional larger bullpens, numbered 1-6. Some of the larger numbered bullpens can house 150 to 200 inmates.

After their court appearance, every inmate is given a court order called a mittimus. A mittimus indicates the disposition of an inmate's criminal case to the Department of Corrections. This document indicates if the inmate is a "possible discharge." Among the returns, the jail identifies any mittimus which indicates a possible discharge and that document is taken to the Records Department. Any inmate ordered discharged remains in custody until the Sheriff determines that there are no other cases or holds which would prevent the inmate from being released. The jail staff checks CIMIS, the jail's computerized record keeping system, in order to determine whether a court discharge has other cases which would require continued detention. In the meantime, the returns are placed in the bullpens within the RCDC.

As of March 2008, the jail housed 9,165 inmates. Of these, 8,436 were male and 729 were female. Approximately 800 to 1,200 inmates go to court on any given weekday. The inmates are transported by bus to different courts. The ratio of male to female inmates is greater than 9 to 1. The same 9 to 1 male to female ratio applies to inmates going to court on a given day. There can be as many as 5 to 6 times more men than women discharged from the jail on any particular day and on average during the year. Approximately 120 female inmates go to court on a daily basis and approximately 30 to 40 female inmates are court discharges. The male returns arrive at the jail throughout the day, commencing

approximately at 10:30 or 11 a.m. until as late as 7 or 8 p.m. The return of male discharges is staggered over the period of 8 or 9 hours.

As a matter of practice and policy, male and female returns are strip searched only upon their return to their respective housing divisions within the jail, not the RCDC. Inmates are returned to the housing divisions when the transportation officers from the inmates' respective housing divisions come to pick them up from the RCDC. This can occur approximately every 30 to 90 minutes or up to two hours depending on the division. The procedure by which male returns are strip searched consist of the following: (1) the inmates are lined up at arm's length from each other; (2) the inmates are instructed to remove all their clothing; (3) the inmates are then instructed to extend their arms and legs apart; (4) the inmates are then ordered to squat three or four times and cough while squatting. The number of inmates being searched at once varies; there is testimony that as many as 50 to 80 male inmates have been searched together.

The policy and practice of strip searching male returns differs from that for female returns. It is the policy and practice of the Sheriff not to give male returns who are to be discharged an option to avoid being strip searched. In contrast, the jail has a specific procedure in place for female returns who are to be discharged which affords them the option of not being

4

strip searched.  Under this procedure, once it is determined that a female return is a possible discharge by the RCDC staff, she is segregated from the general return population by being placed in a separate bullpen within the RCDC.  The female return remains in the separate bullpen until a computer and records check is completed to determine whether the inmate is in fact a discharge.  Any detainees who are determined not to be discharges are removed from the discharge bullpen and placed in the general population return bullpen.  If a female detainee is determined to be a discharge and elects not to return to her housing division, then the Records Department notifies the appropriate housing division that their clothes be brought to the RCDC.  Within the month of October 2003, the average time for female inmates to be discharged was within two hours after returning from court.  The average longest discharge time was 2:42 and the average shortest time was 1:10 for that time period.

When female discharges are strip searched they are placed in a location with privacy dividers among the inmates.  These dividers or privacy screens do not allow inmates to see each other during the strip search.  During the time that the class members were strip searched, the CCDC did not use dividers to afford any privacy to the male discharges.  In February 2007, the Sheriff installed privacy screens similar to those used to search female inmates for searching new inmates (or "arrestees") arriving to the jail.  Up to

37 new male inmates can be strip searched at a time with the privacy screens, and approximately 200 to 350 new male inmates are processed into the jail on a daily basis. Also since 2007, defendants have been using privacy screens when the putative class members were returned to their housing divisions and strip searched. Defendants contend this is a "pilot program," but it is implemented for all court returns and inmates housed in all divisions.

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 787 (7th Cir. 2007); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.

The class certified in this case on June 17, 2005 is defined as follows:

> All male inmates who, on or after February 12, 2002, have been subjected to defendants' policy and practice of strip searching a male inmate upon his return to the jail following a court appearance at which court appearance a specific case or charge against the inmate was dismissed when no other cases, charges, warrants or holds were pending against that inmate which warranted that inmate's continued detention at the jail.

(Order dated 6/17/05, Doc. Entry # 72.)  Plaintiffs' motion seeks summary judgment on the following claims:

> 1.  The strip searching of all male court discharges and not all female court discharges violates the Equal Protection Clause.
> 2.  The strip searching of all male court discharges in large non-private group settings with up to fifty inmates while the female court discharges, who opt to return to the housing divisions, are afforded privacy violates the Equal Protection Clause.
> 3.  The strip searching of all male court discharges not based upon reasonable suspicion that they are concealing contraband violates the Fourth Amendment.
> 4.  Assuming arguendo, the Defendants are entitled to strip search all male court discharges, the manner in which the strip search is conducted, in large non-private group settings violates the Fourth Amendment.
> 5.  There was an unreasonable delay in releasing plaintiffs.

Defendants oppose the motion for summary judgment and have filed their own motion for summary judgment on these claims.

## A.   Equal Protection Claim

In order to make out a prima facie case under the Equal Protection clause of the Fourteenth Amendment, plaintiffs must show that (1) they are "similarly situated" to female inmates with judicial discharges, (2) they were treated differently than such female inmates, and (3) defendants acted with discriminatory intent.  *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). Defendants argue plaintiffs cannot establish the first and third requirements.  I disagree and find plaintiffs have made a prima facie case under the Equal Protection clause.

With respect to the first requirement, defendants argue class members are not similarly situated to female discharges due to their disparity in numbers (roughly five to six times more male potential discharges); propensity for violence; and, on average, lengthier criminal histories, which increase the amount of time needed to make a final determination before final discharge. Defendants also note that men do not have menstrual cycles. According to defendants this is significant because this bodily function is the reason given for providing privacy screens to female discharges. Defendants also rely on *Timm v. Gunter*, 917 F.2d 1093 (8th Cir. 1990), in support of their argument. There, the Eighth Circuit found that inmates at two separate and distinct prisons were not similarly situated due to differences in security concerns "reflecting differences in the number and age of the inmates, the kinds of crimes committed by them, the length of sentences, and the frequency of incidents involving violence, escapes, or contraband." *Id*. at 1103.

Male discharges are similarly situated to female discharges for purposes of the Equal Protection clause if they are "comparable . . . in all *material* respects." *Crawford v. Indiana Harbor Belt R.R. Co.,* 461 F.3d 844, 846 (7th Cir. 2006) (emphasis in original). This requirement is intended to "eliminate confounding variables" and help "isolate the critical independent variable." *Id*. At the outset, the case relied on primarily by defendants is

distinguishable.  *Timm* involved two groups of inmates in two distinct facilities, the Nebraska State Penitentiary - an all-male maximum security prison designed to house prisoners classified as requiring medium or maximum security - and the Nebraska Center for Women.  The present case involves two groups of inmates within the same facility.  The additional reasons set forth by defendants for distinguishing between male and female discharges at the CCDC also fail to establish that these groups are not similarly situated.  Although defendants are correct that the male inmates outnumber the female inmates, there are varying security classifications within each group which correspond to each other (*i.e.* there are both female and male inmates who are classified as "maximum security").[1] The statistics concerning inmate violence clearly indicate this takes place among female inmates as well as male inmates.  Moreover, defendants specifically argue that "low security detainees could be enlisted to help obtain contraband or weapons by fellow inmates," and provide no reason why this does not apply equally to female discharges.  Indeed, female discharges are subject to strip searches for security reasons upon returning to the housing facilities.  Finally, underscoring the weakness of this argument is the fact that defendants' primary justification for distinguishing between male and female discharges is their alleged

---

[1]There is also overlap in staff.  Division 3 (for women) and Division 8 (for men) share the same superintendent and supervisory staff.

inability to hold them in the RCDC while their records are reviewed - a logistical rather than a security concern. Accordingly, I find the plaintiffs are similarly situated to the female potential discharges.

Next, defendants argue plaintiffs cannot establish discriminatory intent. Discriminatory purpose "implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effects on an identifiable group." *David K. v. Lane*, 839 F.2d 1265, 1271-72 (7th Cir. 1988) (emphasis in original). "[I]ntentional disregard of plaintiffs' rights in adopting certain policies [can be] tantamount to intentional discriminatory behavior." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988).

Defendants argue they have no animus toward male discharges, that their motivation is simply to preclude weapons and contraband from being smuggled into the jail. As already set forth and admitted by defendants, however, female discharges are also capable of smuggling contraband into the jail. This salient fact fatally undermines defendants' argument. Accordingly, I find plaintiffs have made a sufficient showing of discriminatory intent.

Since plaintiffs have made a prima facie case under the Equal Protection clause, the issue becomes what level of scrutiny is applicable. Defendants argue that I should apply a rational basis

10

test under *Turner v. Safley*, 482 U.S. 78 (1987). *Turner* held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.

*Turner* does not foreclose all heightened judicial review, however. *See, e.g., Johnson v. California*, 543 U.S. 499, 510 (2005) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) ("reasonable-relationship test [applies] *only* to rights that are 'inconsistent with proper incarceration.'")) (emphasis in original); *Hammer v. Ashcroft*, 512 F.3d 961, 968 (7th Cir. 2008) ("Post-*Turner*, the Supreme Court applies strict scrutiny [] to prison regulations involving suspect classifications such as race.") (citation omitted); *Pitts v. Thornburgh*, 866 F.2d 1450, 1454-55 (D.C. Cir. 1989) (applying heightened scrutiny to Equal Protection claim based on gender discrimination); *Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116, at *7, 9 (N.D. Ill. Aug. 20, 1998) (Coar, J.) (same). Indeed, gender is a "quasi-suspect" class and subject to heightened scrutiny. *Pitts*, 866 F.2d at 1454-55; *Ashann-Ra v. Com. of Virginia*, 112 F.Supp.2d 559, 570-71 (W.D. Va. 2000); *Thompson v. Sheahan*, No. 00 C 3772, 2001 WL 204774, at *3 (N.D. Ill. Mar. 1, 2001); *Gary*, 1998 WL 547116, at *7, 9. Thus, when analyzing gender-based discrimination in the prison context, courts ask whether such policies are substantially related to

important governmental objectives. *Id.*; *see also Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273-74 (7th Cir. 1983).

"[A] party seeking to uphold a policy that expressly discriminates on the basis of gender must carry the burden of showing an 'exceedingly persuasive justification' for the differing treatment." *Id.* at 1273 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). The classification must (1) serve important governmental objectives and (2) be substantially related to the achievement of those objectives. *Id.* at 1273-74 (quotation omitted).

Defendants set forth prison safety and security as their important governmental objectives. This does not appear to be disputed. The issue is whether defendants' policy and practice discriminating between male and female inmates is substantially related to the achievement of those objectives.

The blanket strip search policy of all male potential discharges is not substantially related to the achievement of prison safety and security as articulated by defendants. As exemplified by the policy concerning female discharges, if the jail took appropriate steps to identify and segregate potential discharges upon their return to the jail, the security concerns would be addressed. There can be no dispute that female returns are just as capable of importing contraband into the jail as their male counterparts. For defendants to argue otherwise would suggest

the need to strip search female inmates is obliterated because, according to defendants, the chance they will engage in violence is statistically insignificant.[2]  The fact that there is a greater number of male inmates does not legitimize the constitutional violation.  *See Mississippi Univ. for Women*, 458 U.S. at 725-26 ("The purpose of requiring [a substantial relationship between the objective and the means] is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women."); *see also Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citations omitted) (inquiry used to determine if two employees are similarly situated does not include the ratio of protected class members to particular workforce).  Defendants' logistical explanations for their discriminatory policy have been previously rejected in similar circumstances when assessing their constitutionality under the Equal Protection clause.  *See, e.g.,*

---

[2]Defendants' reliance on the statistical data concerning specific incidents in jail among the male and female inmate populations is faulty.  According to defendants, there is a greater number of male inmates and a greater number of incidents within the male inmate population, therefore male inmates are more dangerous.  This reasoning is faulty precisely because it fails to control for population size.  For example, defendants set forth that 76% of all reported fights involve male inmates.  This means female inmates are responsible for almost a quarter of fights and yet make up less than 10% of the inmate population (specifically 729 in 2008).  Therefore, based on defendants' statistics, individual female inmates are more likely to be involved in fights than male inmates.

*Gary*, 1998 WL 547116, at *2, 9. Accordingly, I find no issue of material fact remains on the question of whether defendants' blanket strip search policy of male discharges deprived plaintiffs of their constitutional right to Equal Protection. Plaintiffs' motion for summary judgment is granted.

Plaintiffs also argue defendants' policy exempting male inmates from obtaining privacy screens violates the Equal Protection clause. With regard to this claim, defendants have first failed to establish there is an important government objective served by failing to afford male inmates privacy screens during strip searches prior to 2007. Indeed, jail staff admits there is no deterrence reason for conducting the searches this particular way, nor do defendants contend that the searches are any less effective in detecting contraband when conducted in a location with privacy screens (as is presently done). For the same reasons, defendants have also failed to establish that searching the discharges in this manner is substantially related to achieving an important government objective. Plaintiffs' motion for summary judgment is granted.

### B. Fourth Amendment

The Supreme Court's landmark decision in *Bell v. Wolfish*, 441 U.S. 520 (1979) governs Fourth Amendment unreasonable search analysis in the prison context. The plaintiffs in *Bell* challenged

the defendants' practice of strip searching all inmates following contact visits. The Supreme Court held:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559. "The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (citing *Terry v. Ohio*, 392 U.S. 1, 18 n.15 (1968)).[3]

The scope of the intrusion here is severe. A strip search is "inherently invasive." *Calvin v. Sheriff of Will County*, 405 F.Supp.2d 933, 938-39 (N.D. Ill. 2005). The Seventh Circuit has reaffirmed that "strip searching involving the visual inspection of

---

[3]Defendants argue plaintiffs do not have an expectation of privacy in light of their status as inmates. This argument is overinclusive as it overlooks plaintiffs' status as discharges and is inconsistent with the law of this Circuit. *See Peckham v. Wisconsin Dep't of Corrections*, 141 F.3d 694, 697 (7th Cir. 1998) ("[D]oes a prison inmate enjoy any protection at all under the Fourth Amendment against unreasonable searches and seizures? . . . the answer is 'yes'"); *Mary Beth G.*, 723 F.2d at 1268-73 (finding searches violated inmates Fourth Amendment rights); *see also Powell v. Barrett*, 496 F.3d 1288, 1314 (11th Cir. 2007) ("[A]t a minimum, reasonable suspicion must exist to justify strip searches of persons entitled to release from the Jail who are to placed in the general jail population while their records are checked for other detention orders, warrants, or holds.").

the anal area are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signify [] degradation and submission." *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (quoting *Mary Beth G.*, 723 F.2d at 1272) (alterations in original) (although police had probable cause to conduct a strip and body cavity search of the plaintiff, the manner in which it was conducted was unreasonable); *see also Calvin*, 405 F.Supp.2d at 938-39. When these searches are conducted in public, the intrusion is considered even more severe. *See, e.g., Campbell*, 499 F.3d at 718-19 (collecting cases). Moreover, plaintiffs - as individuals for whom there is no longer any basis for detention - clearly have a privacy interest which is arguably greater than that of pretrial detainees. *See, e.g., Gary*, 1998 WL 547116, at *13.

The evidence of the manner and location of these searches consists of affidavits by certain class members, attesting they were searched in a large group setting in a "public hallway." In turn, defendants provide incomplete transcripts of depositions of jail staff which provide the staff's impressions that the searches are conducted professionally while attempting to safeguard plaintiffs' privacy. The "hallway" is an "underground tunnel," according to defendants, which connects different housing divisions. Defendants do concede that the searches are conducted in this hallway or tunnel that is used by general staff, but that

at the time of the searches the general staff is not allowed to pass until the searches are completed. There is no dispute that these searches are conducted in large group settings and that inmates are placed at approximately arm's length apart when searched.

Defendants' proposed justifications for conducting these searches boil down to security and administrative concerns. As already set forth, defendants have failed to establish that individual male inmates pose a greater security threat than individual female inmates. Nor have they established that they had individualized reasonable suspicion. *See Calvin*, 405 F.Supp.2d at 943-45; *Gary*, 1998 WL 547116, at *13-14. Indeed, the record reflects that none of the searches of the class members resulted in detection of any weapons or drugs. Only one class member was ever found to have contraband, which consisted of two dollars. *See Mary Beth G.*, 723 F.2d at 1272-73 (the fact that only a few items were recovered in strip searches belied defendants' claim that policy was necessary for security).

With respect to the administrative costs associated with modifying the current policy and practice with respect to class members, defendants fail to effectively distinguish female discharges in making their arguments. Although the number of daily male discharges exceeds that of female discharges, it is not

disproportionate when viewed in light of the jail population breakdown based on gender.

Plaintiffs argue there are several less intrusive and equally effective alternatives to the current policy and practice. They argue specifically that: there is sufficient space in the RCDC to hold male potential discharges until the Records Department determines whether the person is an actual discharge; the jail has the ability to utilize other space besides the RCDC to segregate potential discharges (such as the Criminal Court Building); the jail has the ability to identify before the court appearance whether any male inmates who receive possible discharges have other pending cases by printing out on the inmate's court pass all future court dates which would indicate whether the inmate was a possible discharge; the jail has the ability to identify after court whether any male inmates who receive possible discharges have pending cases; the jail has the ability to use Court Services to identify male inmates who receive possible discharges prior to returning to the RCDC; the jail has the ability to provide additional holding facilities by creating new bullpens to handle court discharges such as in the commissary and commissary storage areas which are adjacent to the RCDC and underutilized and have enough space to house four bullpens capable of holding in excess of 120 inmates (each of these areas would cost approximately $50,000 to $200,000 to construct). Defendants present additional arguments as to why

none of these proposed alternatives are tenable, which are unpersuasive and in some cases unsupported by the record.

Although in *Bell* the Court noted that the existence of a "less intrusive and equally effective alternative" is not dispositive, 441 U.S. at 559 n. 40, courts in this Circuit have found the balance under *Bell* tipped in plaintiff's favor in the presence of reasonable alternatives which undermine defendants' proposed justification. *See Campbell*, 499 F.3d at 719 (finding that the lack of evidence to suggest "any conceivable exigency that could be met only by strip-searching Campbell in public" helped tip *Bell* balance in plaintiff's favor); *Canedy*, 16 F.3d at 188 ("where it is reasonable . . . to respect an inmate's constitutional privacy interests, doing so . . . is a constitutional mandate"); *Calvin*, 405 F.Supp.2d at 943 (noting that strip searches "have repeatedly [been] invalidated . . . based on the reasoning that less invasive searches or other detention practices could obviate the need for a strip search" and that "a prison system cannot rely on the realities of its own detention structure alone to justify an invasion of privacy as significant as a strip search"); *Simenc v. Sheriff of DuPage County, Ill.*, No. 82 C 4778, 1985 WL 4896, at *4 (N.D. Ill. Dec. 9, 1985) ("At a minimum, jail officials should ensure that [] embarrassment is minimized by conducting the search in an area where it cannot be observed by anyone other than the person conducting the search.").

I find the blanket strip search policy of male discharges violates the Fourth Amendment.  The *Bell* factors weigh in plaintiffs' favor.  Accordingly, plaintiffs' motion for summary judgment is granted.

## C.  Unreasonable Delay

Plaintiffs argue they were subjected to unreasonable delays in being released from the CCDC after receiving court-ordered discharges.  Bullock and Reid were delayed 8.5 and 8 hours, respectively.  Defendants argue the complexity of the discharge process justifies such a delay.

The Supreme Court has set forth a 48 hour time limit for probable cause determination after arrest.  *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).  "This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours."  *Id.*  In *Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004) the Seventh Circuit required the government to justify a four hour detention - half the time that is at issue here.  The issue, then, becomes whether the delay was reasonable.  *County of Riverside*, 500 U.S. at 56.

"[T]he reasonableness of a length of detention typically 'is a question best left open for juries to answer based on the facts presented in each case.'"  *Chortek*, 356 F.3d at 747 (quoting *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (holding that

eleven-hour detention of individual waiting to be discharged presented a jury question). "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility." *County of Riverside*, 500 U.S. at 56.

Defendants seek summary judgment on the ground that they have provided a sufficient explanation for the delay and there is no evidence demonstrating an improper purpose for the delay as set forth in *Chortek*, 356 F.3d 747-48. However, both parties have presented conflicting evidence concerning the reasonableness of the delay - mostly in the form of expert testimony. Plaintiffs have provided evidence that the jail computer system is quick, was not malfunctioning, and that the jail staff is able to complete the discharge process for females in a fraction of the time. Accordingly, I find plaintiffs have established there is a triable issue concerning the reasonableness of the delay and defendants are not entitled to summary judgment.

### D. Qualified Immunity

County and local government entities are not covered by the Eleventh Amendment. *Richmand v. Sheahan*, 270 F.3d 430, 439 (7th Cir. 2001) (citation omitted). Defendants argue they are entitled

to summary judgment on plaintiffs' damage claim because the Sheriff, although acting in his official capacity, "could be considered an agent of Illinois government insofar as requiring the strip searching of all male and female inmates who return to their housing division." (Def. Br. At 33-34.)[4]  If the Sheriff were acting as an arm of the state, then the claims for damages may not be brought in federal court.  *Id*.

Defendants cite to the Illinois Administrative Code ("IAC") in support of the proposition that all male and female inmates must be strip searched.  The IAC does not support this.  Instead, it provides

> Detainees permitted to leave the confines of the jail temporarily, for any reason, shall be thoroughly searched prior to leaving and before re-entering the jail.

20 Ill. ADC 701.140(a).  The provision does not mandate strip searches, just that the inmates be "thoroughly searched."  *See Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) (rejecting same argument under the New York Administrative Code).[5]  Defendants have not established the Sheriff was acting as an arm of the state and,

---

[4]It must be noted that this suit concerns the Equal Protection and Fourth Amendment rights of male *discharges* (not all inmates).

[5]Defendants argue that Illinois state appellate court decisions have interpreted "thoroughly searched" under the Illinois Administrative Code to mean strip searched.  Although strip searches were upheld in the cases referred to by defendants, none held that a sheriff was required by state law to conduct a strip search.

therefore, are not entitled to qualified immunity. Their motion for summary judgment on this ground is denied.

IV.

For the foregoing reasons, plaintiffs' motion for summary judgment is granted with respect to all claims except the unreasonable delay claim. Defendants' motion for summary judgment is denied. Defendants also filed a motion to strike, which is denied as moot for I did not rely on the affidavits of Sean Driscoll or Jeffrey Dorsey.

**ENTER ORDER:**

_____
    **Elaine E. Bucklo**
United States District Judge

Dated:  July 30, 2008