**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| QUENTIN BULLOCK and JACK REID, | ) | |
| Individually and on behalf of a class, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No.: 04 C 1051 |
| | ) | |
| MICHAEL SHEAHAN, SHERIFF OF COOK | ) | Judge: Elaine Bucklo |
| COUNTY, in his official capacity, and COOK | ) | |
| COUNTY, | ) | |
| Defendants. | ) | Magistrate Judge Sidney Schenkier |

**RULE 54(B) MOTION FOR RECONSIDERATION**

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  THIS COURT VIEWED THE EVIDENCE IN A LIGHT FAVORABLE TO
     MOVANTS AND IMPROPERLY DISREGARDED DEFENDANTS' EVIDENCE
     THAT CREATED GENUINE ISSUES OF MATERIAL FACT .....................................4

III. THE COURT ERRED IN ADOPTING THE TEST OF "LESS INTRUSIVE
     ALTERNATIVES." .............................................................................................13

IV.  THIS COURT ERRONEOUSLY SHIFTED THE BURDEN  AND IMPOSED THE
     DUTY TO ASCERTAIN "INDIVIDUALIZED REASONABLE SUSPICION" ON
     DEFENDANTS.....................................................................................................18

V.   DEFENDANTS WERE IMMUNE UNDER THE ELEVENTH AMENDMENT. .........19

VI.  CONCLUSION....................................................................................................20

6350485v1  838428  51151

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Adams v. City of Chicago*,469 F.3d 609 (7th Cir.2006)................................................13

*Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir.2004) ....................................1

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................1, 4

*Bell v. Wolfish*, 441 U.S. 520 (1979) ..................................................... passim

*Calvin v. Sheriff of Will County*, 405 F.Supp.2d 933 (N.D.Ill. 2005)..........................15

*Campbell v. Miller*, 499 F.3d 711 (7th Cir.2007) ...............................................14, 15

*Canedy v. Boardman*, 16 F.3d 183 (7th Cir.1994)...............................................15

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...............................................19

*Central Nat'l Life Ins. Co. v. Fidelity and Deposit Co. of Maryland*,
   626 F.2d 537 (7th Cir.1980) ...............................................................1

*Colby v. J.C. Penney Co.*, 811 F.2d 1119 (7th Cir.1987)........................................15

*Del Raine v. Williford,* 32 F.3d 1024 (7th Cir.1994) .........................................3, 14

*Elliot v. Lynn*, 38 F.3d 188 (5th Cir.1994), *cert denied,* 514 U.S. 1117 ....................................15

*Farmer v. Perrill*, 288 F.3d 1254 (10th Cir.2002)................................................3, 16

*Gary v. Sheahan*, 1998 WL 547116 (N.D.Ill. Aug. 20, 1998) ...............................7, 15

*Gould v. Bowyer*, 11 F.3d 82 (7th Cir.1993) ...............................................15

*Guzman v. Sheahan,* 495 F.3d 852 (7th Cir.2007).............................................2

*Johnson v. Phelan*, 69 F.3d 144 (7th Cir.1995),
   *cert. denied,* 519 U.S. 1006 (1996) ...............................................2, 13, 14, 15

*Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir. 1988)..............................................3, 5, 6

*Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737 (1976) ...............................................1

*Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983) ...............................19

*New Jersey v. T.L.O.,* 469 U.S. 325 (1985)...............................................19

ii

*Overton v. Bazzetta*, 539 U.S. 126 (2003)...................................................................................19

*Peckham v. Wisconsin Dept. of Corrections*, 141 F.3d 694 (7th Cir.1998)................................15

*Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28 (1st Cir.1990)...............................................1

*Rossy v. Roche Prod., Inc.* 880 F.2d 621 (1st Cir.1989).................................................................1

*Simenc v. Sheriff of DuPage County, Ill.,*
     No. 82 C 4778, 1985 WL 4896 (N.D.Ill. Dec. 9, 1985).......................................................15

*Skinner v. Ry. Labor Exec. Assn.,* 489 U.S. 602 (1989).............................................................14

*Sparks v. Stutler*, 71 F.3d 259 (7th Cir.1995), *cert. denied*, 519 U.S. 948 (1996) .......................14

*Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004) ...................................................................3

*Thompson v. Souza*, 111 F.3d 694 (9th Cir.1997) .......................................................................15

*Timm v. Gunter*, 917 F.2d 1093 (8th Cir. 1990) .........................................................................12

*Townsend v. Fuchs,* 522 F.3d 765 (7th Cir.2008)........................................................................16

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646 (1995).................................................3, 14, 19

*Wilkes v. Sheahan*, N.D. No.01C1592 ...........................................................................................9

*Winston v. Lee,*470 U.S. 753 (1985) ...............................................................................................3

## OTHER AUTHORITIES

20 Ill.Adm.Code §701.140(a)........................................................................................................19

Fed. R. Civ. P. 54(b) ........................................................................................................................1

Fed. R. Evid. 407 ...........................................................................................................................13

6350485v1  838428  51151

Defendants move the Court for reconsideration, pursuant to Fed. R. Civ. P. 54(b),[1] of the Court's July 30, 2008 Order as follows:

## I.   INTRODUCTION

In ruling on a summary judgment motion, this Court's role is to view both the evidence and reasonable inferences that can be drawn from that evidence in a light favorable to the nonmoving party, here the defendants.  It then must decide if there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (holding "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" when considering a summary judgment motion).  This Court acknowledged, but then failed to apply, this established law because it reviewed the disputed facts (many of which this Court erroneously labeled as "undisputed"), viewed the evidence in a light favorable to the movants/plaintiffs, weighed the evidence, disregarded defendants' expert testimony and evidence, and then made findings of fact, thereby usurping the jury's role.

Among this Court's impermissible findings of fact were the defendants' "intent" and whether the defendants' actions in strip searching were "reasonable."   Yet, intent and reasonableness are quintessential examples of fact-specific inquiries that depend on the totality of circumstances.  *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 31 (1st Cir.1990) ("When intent is an issue, we have held that our review 'will be most searching' since these questions are most suited for jury determinations" and citing *Rossy v. Roche Prod., Inc.,* 880 F.2d 621, 624 (1st Cir.1989)); *Central Nat'l Life Ins. Co. v. Fidelity and Deposit Co. of Maryland*, 626 F.2d 537, 540 n.6 (7th Cir.1980) ("Where intent is a controlling element, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be judged by the trier of facts after observation of the witnesses during direct and cross-examination.").

This is equally true when the issue is reasonableness of the officials' actions.  *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir.2004) (reversing summary judgment because of the "fact specific nature of the injury" on an excessive force claim, holding that the excessive force claim had to be determined in the totality of the circumstances and whether the governmental interests were outweighed by the "nature and the quality of the intrusion on plaintiff's Fourth Amendment interests" was a determination for the factfinder).

---

[1] Because this Court's order did not adjudicate all claims as to all parties it may be revised at any time before the entry of judgment.  Fed.R.Civ.P. 54(b).  *See also Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 744 (1976) (holding that orders granting partial summary judgment "are by their terms interlocutory").

Although this Court holds that reasonableness is a fact question with respect to the plaintiffs' delay in discharge claim (Op. 20), it then states that reasonableness is a legal question with respect to less intrusive alternative measures (Op. 14-20). This inconsistent application of tests for fact-specific inquiries is improper.

When this action is appealed, the Seventh Circuit's review will not be deferential, but *de novo*. *Guzman v. Sheahan,* 495 F.3d 852, 856 (7th Cir.2007) (citation omitted). Trying this case without submitting the issues of liability on the strip searches to the jury as the factfinder, will waste of judicial resources should the Seventh Circuit reverse because of the genuine issues of fact shown by the conflicting expert opinions and evidence contained in this record. This Court should vacate its finding of liability because there are genuine issues of material facts.

The law on strip searches and pretrial detainees is discussed extensively in the cross-motions for summary judgment and is not repeated, but adopted, herein. However, it must be noted that this Court's rulings conflict with the binding precedent of the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 558-63 (1979) and of the Seventh Circuit in *Johnson v. Phelan*, 69 F.3d 144 (7th Cir.1995), *cert. denied*, 519 U.S. 1006 (1996).

- This Court struck the visual strip search as unreasonable (Op. 14-20). In *Bell*, a similar strip search – a visual examination of the genitals and buttocks – was upheld as a reasonable means to maintain security "after every contact visit with a person from outside the institution." 441 U.S. at 558-60 & n.39. The Supreme Court rejected the district court's holding that the institution had to show probable cause to strip search and rejected the appellate court's holding that the "gross violation of personal privacy inherent in such search cannot be outweighed by the government's security interest." *Id.* at 558. The Court held that these searches did not violate the Fourth Amendment, which only prohibits "unreasonable searches. *Id.* at 558. It held that the visual body-cavity inspections are appropriate when "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates" *Id.* at 560.

- This Court made the fact finding and accepted the position of plaintiffs and their expert that there were other less intrusive means and a more private place to strip search (Op. 12-14, 18-19). This Court believed that *Bell* held that the existence of less intrusive alternatives is "not dispositive" (Op. 19). In fact, *Bell* rejected the test of whether there was a "less intrusive and equally effective alternative to cavity inspections." *Id.* at 559 n.40; *Phelan*, 69 F.3d at 145 ("Less-restrictive-alternative arguments are too powerful: a prison always can do something, at some cost, to make prisons more habitable, but if courts assess and compare these costs and benefits then judges rather than wardens are the real prison administrators."). *See* §III, *infra*.

- This Court found that the defendants' method of searching was unreasonable (Op. 14-20), but the *Bell* test mandates "balancing of the need for the particular search against

2

the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559. The searches here comported with *Bell* and were constitutionally valid. Alternatively, this is a fact-dependent inquiry for a jury, not a judge faced with conflicting expert opinions and evidence. *Farmer v. Perrill*, 288 F.3d 1254, 1261 (10th Cir.2002) (whether defendants' legitimate, penological interests justified search in open area is question of fact not properly decided on motion for summary judgment).

- This Court also dismissed defendants' position in part because the history of searches only found one instance of contraband (Op. 17). This identical argument was made – and rejected – in *Bell*. The Supreme Court held: "That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent that to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Id.* at 559. As the Seventh Circuit has held, "[i]t cannot be questioned that the body cavities of prisoners are capable of secreting a surprising array of objects, and that inmates are willing to go to extreme lengths to obtain weapons and illicit drugs." *Del Raine v. Williford,* 32 F.3d 1024, 1042 (7th Cir.1994) (citations omitted). It is because of this that the government has a "need to search, both visually and physically, such private parts of the body." *Id.*

A final note. The class members are individuals who were lawfully arrested and detained at the jail pending disposition of their case. *Bell,* 441 U.S. at 536 (pretrial detainees have had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [their] liberty following arrest" and are lawfully committed). This Court holds that as soon as the detainee returns from court, that detainee automatically has increased privacy rights (Op. 16). Those detainees have a reduced expectation of privacy as long as they are within the confines of the jail. *Lewis v. O'Grady*, 853 F.2d 1366, 1369 (7th Cir. 1988). *Accord Sullivan v. Bornemann*, 384 F.3d 372, 376-77 (7th Cir. 2004) (quoting *Winston v. Lee*, 470 U.S. 753, 758 (1985)) ("While the Fourth Amendment does protect [detainee's] expectations of privacy, the law provides that this applies only to 'legitimate expectations that *in certain places and at certain times* [an individual] has the right to be let alone'" (original emphasis)). The "special needs" of the institution to maintain security dictate that visual searches of court returnees are reasonable. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653-54 (1995) (noting that there is a "special need" that exists in a school context in order to maintain discipline and order in the schools). The fact that some – not all – of the pretrial detainees who return from court will be ultimately released does not eviscerate the defendants' interest in maintaining the security at the jail – the largest single site jail in the country.

3

## II.   THIS COURT VIEWED THE EVIDENCE IN A LIGHT FAVORABLE TO MOVANTS AND IMPROPERLY DISREGARDED DEFENDANTS' EVIDENCE THAT CREATED GENUINE ISSUES OF MATERIAL FACT

This Court disregarded defendants' evidence, weighed the evidence, ignored defendants' experts' opinions, made credibility findings and made findings of fact, concluding it was not "persuaded" (Op. 19). This is not the role of this Court, which is to determine if there was a genuine issue of material fact based on the evidence when viewed in a light favorable to the defendants. *Anderson*, 477 U.S. at 249. There are genuine issues of material facts, and summary judgment was improper. The evidence that defendants submitted which conflicts with this Court's fact findings include:

- This Court finds, "The following facts are not in dispute . . . Aside from the smaller bullpens A, B, C, and D, the male intake area of the RCDC has six additional larger bullpens, numbered 1-6. Some of the larger numbered bullpens can house 150 to 200 inmates" (Op. 2).

This finding is both inaccurate and taken out of context. The "bullpens" referred to in this statement are not located in the RCDC but in the basement tunnel area of the Criminal Court Building ("CCB") known as the "Bridge" (Ex.C ¶63).[2] The Department of Corrections ("DOC") officers work at the male Bridge in the morning, and Court Services relieves at 1:00 p.m. At that point, if the bullpens are full on the Bridge, the DOC officers will bring those inmates who have returned from court and are staged in Bullpens 4, 5, and 6 on the Bridge back to the jail. Court return inmates cannot be taken over to the RCDC in the jail between 3:00 and 4:00 p.m. because Central Bond Court is not over (Ex.C ¶103). There are holding cells (also called bullpens) designated 1, 2, and 3 on the "female bridge," and the "male bridge" consists of cells designated 4, 5, 6, 7, and 8 (Ex.C ¶¶ 63-65). On an average day, between 1:30 and 4:00 p.m. there are 150 to 200 males in 5 and 6 on the Bridge (Ex.C ¶104). After the approximately 150 to 200 male inmates are brought to the RCDC by Court Services around 4:00 p.m., or when the jail advises that it is clear, it varies from day to day on how many court returns will be brought down to the Bridge and at what time. Court Services, which is manning the bridge, can only bring a maximum of 50 inmates back to the RCDC in the jail at a time (Ex.C ¶105; Ex.A ¶143).

---

[2] All factual statements appearing in this Motion for Reconsideration are taken from either Defendants' Response to Plaintiffs' Rule 56.1 Statement of Uncontested Facts, as Exhibit A ("Ex. A"), or from Defendants' Statement of Additional Facts that require the denial of summary judgment, as Exhibit B ("Ex. B"), or Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Facts, as to Exhibit C ("Ex. C"), or Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1, as Exhibit D ("Ex. D"), or Plaintiffs' Response to Defendants' Statement of Material Facts referred to as Exhibit E ("Ex. E").

6350485v1 838428 51151

Contrary to this Court's finding, it is disputed that any single bullpen on the Bridge or in the RCDC has the capacity to hold anywhere near 150 to 200 inmates. Each of the larger bullpens in the RCDC can hold up to 40 inmates (Ex.A ¶135). Even taking plaintiffs' disputed evidence at face value, the maximum number of inmates that can be accommodated in a larger bullpen is up to 50, 60 or 80, depending on which piece of the plaintiffs' inconsistent evidence is reviewed (Ex.A ¶¶133, 135, 138; Ex.B ¶¶133, 135; Ex.D ¶¶135, 138).

This Court's finding was made in support of plaintiffs' contention that there is sufficient space in the RCDC to hold male potential discharges until the Records Department determines whether the person is an actual discharge. However, this is a disputed fact and is material insofar as it is not feasible for the jail to provide male prisoners with the same option as female prisoners due to the lack of secure space and vastly greater number of male prisoners involved in the process (Ex.A ¶¶117, 122-25, 131, 133-34; Ex.B ¶¶16, 40, 123; Ex.C ¶¶71-83).

- This Court finds that another undisputed fact is "a mittimus indicates the disposition of an inmate's criminal case to the Department of Corrections. This document indicates if the inmate is a 'possible discharge.' . . . any inmate ordered discharged remains in custody until the Sheriff determines that there are no other cases or holds which would prevent the inmate from being released. The jail staff checks CIMIS, the jail's computerized record keeping system, in order to determine whether a court discharge has other cases which would require continued detention" (Op. 3).

The Court's description of an inmate as a "possible discharge," or an inmate ordered discharged as interchangeable misconstrues the evidence, is ambiguous and is not on point. Based on the uncontested findings in the "Brown Study," 44% of male court return pretrial detainees who receive court ordered dischargeable dispositions on a given criminal case or charge cannot be released from the jail due to the existence of additional pending criminal cases, charges, warrants and/or holds (Ex.C ¶124). Therefore, even if the court disposes of a case or charge, it cannot order the inmate to be discharged until a determination is made that no other basis exists to detain the inmate. In *Lewis*, the Seventh Circuit held that notwithstanding a court's disposition of pending criminal charges in favor of the defendant/pretrial detainee, the sheriff retains the legal authority to continue to hold the defendant in custody for a reasonable period of time pending the sheriff's taking of necessary administrative tasks, including transporting the defendant from court back to the jail, verifying said defendant's identity, *checking for the existence of other warrants or mittimuses against the defendant*, completing paperwork, and other administrative steps. 853 F.2d at 1369 (emphasis added).

Further, this Court failed to take into account this record that a trial judge does not order the release of an inmate from the county jail.  A "possible discharge" on a mittimus does not necessarily qualify a detainee (a/k/a inmate) for membership in the putative class, nor does it necessarily authorize the release of that inmate from the CCDOC (Ex.A ¶9; Ex.B ¶9; Ex.C ¶35).  When an inmate comes back from court with a possible discharge on a mittimus, the jail staff cannot simply check CIMIS to determine whether a potential discharge is an actual discharge.  Viewing the evidence in favor of plaintiffs, this Court accepted plaintiffs' characterization of the CIMIS system as one that enables quick and easy access to information.   CIMIS breaks down frequently, with individual work stations failing almost daily, and every few months the entire CIMIS system fails (Ex.A ¶78).  CIMIS failures can create time delays and/or a reduction in the number of terminals available for use, and has been non-functioning as long as eight hours.  CIMIS is the management information system at the CCDOC.  It is an offender tracking system that stores data in the late 1970's-fashion (Ex.A ¶78; Ex.B ¶70).

Further, checking CIMIS is only the first step to see if the individual has other charges, cases or holds that would require continued detention.  When an inmate comes back from court with a mittimus, each mittimus is time stamped in the RCDC.  Once the mittimus papers are brought up to the records unit at the CCDOC, there are five administrative assistants who work the 12 p.m. to the 8 a.m. shift Monday through Friday, who review mittimus papers and complete jail files, page by page and cover to cover for inmates who have attended court on a given date and who have received a court order disposing of a given criminal case or charge (Ex.B ¶¶10-11).  Plaintiffs' jail policy expert Sheila Vaughan concedes that CIMIS alone is not sufficient to determine whether an inmate returning from court with a mittimus indicating a dismissal of a particular criminal case or charge is actually eligible for discharge.  Instead, Vaughan agrees that in all such instances, each such inmate's complete paper jail record or file must be checked before the inmate is deemed to be actually eligible for release from the jail's custody (Vaughan 4/6/06 report, p. 6 of 23, "Tab 26" to Pl. LR56.1 Stmt).

In general, it takes additional time for the records department to review the files of male vs. female potential discharges.  This is related to the disproportionately greater number of male potential discharges compared to female potential discharges on any given day, the disproportionately greater amount of file information which must be reviewed for male potential discharges compared to female potential discharges, as well as the limited resources available at

6

the jail. This process can take varying amounts of time, but depending on the file, it could take six hours or even two days (Ex.A ¶78; Ex.B ¶11).

- This Court finds that there "there is testimony that as many as 50 to 80 male inmates have been searched together" (Op. 4). It then concludes that the policy and practice of strip searching male *returns* differs from that for female *returns*.

This testimony the Court refers to has no relevance to the strip searching of returns. Plaintiffs in this case sued because *after receiving a court order dismissing* a particular criminal charge against them, they had to return to their respective housing division at the Cook County Department of Corrections ("CCDOC") and were strip-searched in the division, although they were a potential discharge (Ex.C ¶¶7, 9)  This testimony from the *Young* case, however, only relates to processing of new arrestees into the jail (Ex.A ¶¶24-25; Ex.17 in Table of Exs. for Resp. to Pl. Stmt of Mat. Facts, pp. 158-62, 186-89, 262-64). It has nothing to do with the different option provided to female court returns with potential discharges versus male court returns with potential discharges. In the instant case, procedures on new arrestees (male or female) is irrelevant. No evidence was submitted on differences, if any, in procedures that are utilized to process new female arrestee into the jail versus new male arrestees. The facts, circumstances and context of this strip search testimony referenced by the Court is completely different from the instant case and misapprehends the issues to be addressed herein (Ex.A ¶25).

- This Court also finds, "it is the policy and practice of the Sheriff not to give male returns who are to be discharged an option to avoid being strip searched. In contrast, the jail has a specific procedure in place for female returns who are to be discharged which affords them the option of not being strip searched" (Op.4).

This record is replete with evidence disputing the contention that it is feasible to provide male court returns with a potential discharge disposition with the same option as female court returns. This Court relies on the trial court decision in *Gary v. Sheahan*, 1998 WL 547116 at *1, 14 (N.D.Ill. Aug. 20, 1998). Two witnesses played a prominent role in the *Gary* case, Robert Glotz and John Maul. Their testimony in this case clearly demonstrates why an issue of fact is present as to whether the identical option can be provided both female and male inmates returning from court with a potential discharge disposition. Glotz actually served as one of *plaintiffs*' experts in *Gary*. In *Gary*, both Glotz and Maul opined that it was feasible to offer women the option of not being strip searched because there were only *8 to 10 females prisoners potentially then being discharged each week*. Both testified in this case that the same option cannot be provided to male detainees because there are so many more men and because of the

7

lack of safe and secure space to hold them for a number of hours while their jail packets are being reviewed (Ex.A ¶¶37-42, 145; Ex.B ¶¶37-40; Ex.C ¶¶42-43; Ex.E ¶¶42-43).   This testimony is consistent with the testimony given by the jail administrators and the Sheriff's expert witnesses in this case, including that for a multiple of reasons (outlined in Defendants' Local Rule ("LR") 56.1 submissions), it is simply not feasible to offer men the same option (*See* Ex.A ¶¶15-16, 30-31, 47, 50, 122-125, 131-136, 146-158; Ex.B ¶¶16, 30-31, 44-48, 50, 123, 128, 133, 135, 153; Ex.C ¶¶13-18, 26, 30-32, 40, 41, 44, 72-75; Ex.E ¶¶13-18, 26, 30-32, 41, 72-75).   These reasons include that the number of male inmates returning from Court can exceed the number of female inmates by a factor of 10, male and female inmates require different practices and procedures for safe, secure and efficient movement, staging and processing.   Moreover, space limitations and the maintenance of security in the jail prevent male inmates from being provided the same option as female inmates.   Given the larger number of male inmates who receive a discharge disposition on a single case or charge for which they appear in court on a given date, compared to female inmates with discharge dispositions, the male inmates cannot be kept safely in separate bull pens after court appearances for a number of hours due to potential safety, security, sanitary and health problems.   The sheer volume of male inmates and lack of space creates a potential for violence and disturbances among male inmates themselves and between male inmates and correctional staff (Ex.B ¶¶16, 39-40, 44-48; Ex.C ¶¶37-39, 42-44).

Thus, while it is feasible to provide female court returns with potential discharges the option of remaining in the RCDC or returning to their housing divisions because of the low numbers, it is not feasible for males to remain in the RCDC and not be returned to the housing divisions (Ex.A ¶¶37-42, 145; Ex.B ¶¶37-40; Ex.C ¶¶13-17, 42-43, 74; Ex.E ¶¶13-17, 42-43, 74).   Females have "one set of circumstances in one area of the facility that is utilized for them and they take up much less space," there are "a lot lower numbers" and "it takes a lot less staff to process them compared to the males" (Ex.C ¶¶51, 74; Ex.E ¶74).   The material issues of whether males and females are similarly situated and whether it is feasible to provide male court returns with a potential discharge with the same option as the female court returns with potential discharges, are a disputed questions of fact for a jury to decide.

- This Court finds "when female discharges are strip searched they are placed in a location with privacy dividers among the inmates.   These dividers or privacy screens do not allow inmates to see each other during the strip search" (Op. 5).   This Court also finds "Defendants also note that men do not have menstrual cycles.   According

8

to Defendants, this is significant because this bodily function is the reason given for providing privacy screens to female discharges" (Op. 8). [3]

At the CCDOC, privacy screens have been and are now used for female strip searches. Females, in any correctional setting, are not similarly situated to men and present special issues due to the fact that women menstruate.  This Court acknowledges this difference but still finds males and females are "comparable in all material respects" and, therefore, similarly situated. Females are provided a disposable mat to stand on for the strip search.  A fresh supply of sanitary napkins is readily available.  Appropriate disposal of used sanitary napkins is also readily available.  These accommodations are provided to female inmates to eliminate embarrassment in a group setting and to prevent potential infection to other inmates and correctional staff from these bodily fluids (Lane's 1/28/08 Report in Dfts' Table of Exs. for LR56.1 Stmt. of Undisputed Facts as Ex. 7D, pp. 6-7).  This difference in bodily function is the primary reason why female inmates have been and continue to be provided with privacy screen during the strip search process, which was before a "pilot project" was implemented for male inmates.  Defendants provided a multitude of additional factors to be considered for why previously only females and not males were provided with the dividers (*See* Lane and Moyer Reports attached to Dfts' Stmt. of Undisputed Facts, Exs.7D, 8C).

In finding that providing privacy screens to females but not males violated the Equal Protection clause, the Court held that defendants "failed to establish there is an important government objective served by failing to afford male inmates privacy screens" and "failed to establish that searching the discharges in this manner is substantially related to achieving an important government objective" (Op. 14).  The Court suggests that the failure to provide screens does not increase deterrence nor improve the effectiveness of the searches in uncovering contraband.  In so holding, the Court has ignored entirely the central justification defendants have offered for providing screens for women.

Reframing the issue will make this point clearer.  The issue is better understood as whether the defendants had a legitimate interest in providing the screens for women, not whether they had a legitimate interest in failing to provide them to men.  Defendants articulated this

---

[3]  In the separate lawsuit of *Wilkes v. Sheahan*, N.D. No.01C1592, relief was sought for strip searches conducted when women were having their menstrual cycles and were exposed to the embarrassment of having blood run down their legs onto the floor.  It was alleged that other women in the strip search groups were subject to potential infection from these bodily fluids.  The *Wilkes* case was never certified as a *class* action.  *Wilkes* was dismissed by agreement and stipulation of the parties (Ex. A, ¶ 21; Ex. B, ¶ 21).

interest clearly, as addressed extensively in section II above: women, unlike men, menstruate and privacy screens shield them from embarrassment related to this bodily function.  There can be little doubt that providing privacy screens is substantially related to the objective of protecting women from embarrassment related to menstruation.  The Court makes no finding that such an objective is somehow illegitimate.  In asking only whether there was a good reason not to provide screens to men, this Court overlooked the sound reason for providing the screens to women – a reason that simply does not apply to men.  This – together with the differences in population size and available facilities – is why summary judgment should have been entered in favor of defendants.  Alternatively, the question of the reasonableness of these accommodations for different bodily functions based on gender is an issue to be decided by the trier of fact.

- This Court erroneously finds there is another undisputed fact, stating "Also since 2007, Defendants' have been using privacy screens when the putative class members were returned to their housing divisions and strip searched.  Defendants *contend* that this is a 'pilot program,' but it is implemented for all court returns and inmates housed in all divisions" (emphasis supplied) (Op. 6).

Beginning in late 2007, a pilot project was initiated at the jail to evaluate the efficiency and practicality of use of dividers or privacy screens during the strip-search of male inmates upon their return to their housing divisions following court appearances (Ex.B ¶19).  Safety and security is the paramount concern in a correctional facility, and therefore such a concern will need to be carefully evaluated in terms of whether this pilot program is, in fact, implemented on an ongoing and/or permanent basis (Brown March 2008 Affid. at ¶¶10-12, attached to Table of Exs. for Resp. to Pl. Stmt. of Mat. Facts and Dfts' Add'l Facts as Ex. 16).  This procedure remains under evaluation.  (*See* Lane and Moyer Reports attached to Dfts' Stmt. of Undisputed Facts, Ex. 7D, pp. 3-6, and Ex. 8C, pp. 2-5, 14-15).  Its statement that defendants "contend" this to be a "pilot program" shows that this Court is rejecting the credibility determination of defendants' witnesses and, after weighing the evidence (instead of weighing it in a light favorable to defendants), makes a fact finding.  Yet, this is the function of a jury, not a court in ruling on a summary judgment motion.  Although there is no constitutional mandate for the use of privacy screens during strip searches (for either males or females), the jail is evaluating alternative methods in order to determine *best practices* (Ex.C ¶46).  The reasonableness of defendants' actions with regard to the screens is an issue for the trier of fact.

- This Court finds "The statistics concerning inmate violence clearly indicate this takes place among female inmates as well as male inmates" (Op. 9), and subsequently footnoting:

> Defendants' reliance on the statistical data concerning specific incidents in jail among the male and female inmate population is *faulty*. (emphasis supplied). According to Defendants, there is a greater number of male inmates and a greater number of incidents within the male inmate population, therefore male inmates are more dangerous. This reasoning is *faulty* (emphasis supplied) precisely because it fails to control for population size. For example, Defendants set forth that 76 percent of all reported fights involve male inmates. This means female inmates are responsible for almost a quarter of fights and yet make up less than 10 percent (specifically 729 in 2008). Therefore, based on Defendants' statistics, individual female inmates are more likely to be involved in fights than male inmates.

(Op. 13 & n.2).

In concluding men and women are similarly situated, this Court impermissibly weighed the conflicting evidence by relying on this piece of statistical data regarding "fights" to obliterate the factual issue concerning whether or not male inmates have a greater tendency for violence than female inmates. This amounts to the weighing of conflicting facts, a job for the trier of fact. Further, this Court is substituting its discretion for that of the experienced correctional administrators, who deal with these issues on a daily basis. *Bell,* 441 U.S. at 547-48.

Not all violence is equal. Of particular concern to the jail officials are "shanks," which are any type of object fashioned by an inmate from another object such as a toothbrush, pen, piece of metal, wood, glass, plastic, etc. and which is used or intended to be used to stab another person (Ex.C ¶54; Ex.E ¶54). The CCDOC and Court Services staffs have discovered homemade weapons, drugs and contraband during strip searches of male inmates while attending and/or returning from court in their divisions in the jail (Ex.C ¶30). This record contains various examples of incident reports that demonstrate the repeated occasions whereby male inmates admitted and/or were actually observed obtaining contraband while in court and/or inside a court room lockup cells, including one incident whereby a detainee obtained a 35-inch metal shank from a radiator located within courtroom 308's lockup cell following a court appearance. In at least one instance, "inmates on the new" (new arrestees) were observed passing contraband to male court returns (Ex.C ¶31, 54; Ex.E ¶54).

Plaintiffs failed to provide conflicting evidence showing female court returns (with or without a discharge disposition) attempted to secrete the dangerous shanks that can be used to stab other inmates or correctional staff, into the jail. Statistically, 99 percent of all shanks recovered at the jail are from male prisoners (Ex.C ¶¶54-55; Ex.E ¶54). It is imperative to take

the appropriate security measures to prevent the potential violence that can be inflicted with such weapons. This Court also disregarded the significance of the self-reported male gang affiliations at the jail, as compared to female (1,714 males to 19 females) (Ex.C ¶56; Ex.E ¶56). Gang affiliations add more elements of danger to an already dangerous place (Lane 5/4/06 report pp. 8-9, Ex. 7B to Table of Exs. for LR56.1 Stmt. of Undisputed Facts). Further, 100% of all fires started at the jail involved males (Ex.C ¶55).

This Court rejected this evidence, stating ". . . , female discharges are also capable of smuggling contraband into the jail" (Op. 10). This is reason why *all* inmates are strip searched upon their return to the housing divisions, for safety and security.

This Court held that because women are "capable" of violence, men and women are similarly situated (Op. 13, n.2). Statistically, males are far more likely to be members of violent gangs, start fires, and create shanks which sole purpose is to stab a person. That females are "capable" does not mean that their violent acts are similar to males' violence. Weighing the statistical data and facts relating to violent behavior at the jail is a material issue of fact for a jury to decide. These fact-intensive inquiries on the reasonableness of defendants' actions must be resolved by a jury. Differences in kind and frequency of violent acts committed by men and women relevant to deciding of two groups were similarly situated. *Timm v. Gunter*, 917 F.2d 1093, 1103 (8th Cir. 1990). Indeed, the significance of these factors does not depend on the men and women being housed in separate buildings rather than separate division of the same building, the only distinction this Court made between the present case and *Timm*.

- This Court holds: "Finally, underscoring the weakness of this argument is the fact that defendants' primary justification for distinguishing between male and female discharges is their alleged inability to hold them in the RCDC while their records are reviewed – a logistical rather than a security concern" (Op. 9-10)

This Court improperly weighs the evidence and makes a credibility determination as evidenced by its characterization of defendants' evidence that only proves an "alleged" inability to hold male potential/actual discharges in the RCDC separate from other male court returns (as is done with female actual/potential discharges). Second, this statement mischaracterizes and ignores evidence in the record. Defendants pointed to multiple witnesses' testimony and/or Rule 26 reports referencing multiple safety/security issues as to why each of the *specific* proposals offered by plaintiffs' retained experts Henry, Vaughan, Rubio and Moliver cannot be implemented at the jail, as well as various safety/security issues that were not considered or disregarded by plaintiffs' experts (*See, e.g.,* Dft. Mo/SJ, p. 9). After weighing the evidence, this

12

Court rejected defendants' "primary justification" (security) for distinguishing between genders as a "logistical," not security, concern (Op. 9-10).[4]  The logistics and security are not mutually exclusive, and the former must always factor into maintaining the latter.  Further, this Court cites no controlling authority that would suggest that logistical concerns are irrelevant.  To the contrary, in mandating deference to prison administrators, cases like *Bell* and *Phelan* underscore the significance of the logistical concerns administrators are in the best position to weigh.  *Bell*, 441 U.S. at 559 n. 40; *Phelan*, 69 F.3d at 145.

- This Court references the Jail's Pilot Program which, beginning in 2007, implemented the use of privacy screens or dividers in the strip searching of all male inmates returning to the eight separate male housing divisions at the jail, including those returning from court appearances (which, in turn, includes those male inmates who are potentially/actually eligible for discharge from custody) (Op. 5-6, 8, 14).

In their Reply in Support of Summary Judgment, defendants set forth their reasons and supporting authorities as to why evidence of this pilot program was inadmissible in the instant action, including, *inter alia*, the fact that the record indicates that the Sheriff never disputed the feasibility of implementing the use of privacy screens or dividers to search male inmates returning to their housing divisions following court appearances (Dft's Reply, pp. 23-27).  Defendants also distinguished *Adams v. City of Chicago*, 469 F.3d 609 (7th Cir.2006) (relied upon by plaintiffs for their argument that an exception to Fed. R. Evid. 407 applied).  For these reasons, defendants submit that this Court erred in considering evidence of the pilot program in granting plaintiffs' motion for summary judgment.

### III.   THE COURT ERRED IN ADOPTING THE TEST OF "LESS INTRUSIVE ALTERNATIVES."

This Court also concludes that the manner in which the searches at issue are conducted violates the Fourth Amendment because "less restrictive, equally effective" alternatives – such as are provided to women – are available (Op. 12-14, 18-19).  The Court's conclusion rests on an erroneous application of the law and an impermissible weighing of the conflicting evidence presented by the parties.  Based on the uncontested facts, summary judgment should have been entered for defendants or, alternatively, there are questions of fact for a jury to resolve.

First, this Court suggests that *Bell* held the existence of such alternatives can be considered, but "is not dispositive" (Op. 19).  There can be no doubt that *Bell* did not adopt – or

---

[4]   This Court improperly conflates the Fourteenth and Fourth Amendment analysis in finding that administrative costs under the Fourth Amendment could be dismissed because "defendants failed to effectively distinguish female discharges" (Op. 17).

sanction – a "less intrusive alternative" test; it expressly rejected this. 441 U.S. at 559- 60 n. 40. As the Supreme Court has held:  "We have repeatedly refused to declare that only the "least intrusive" search practicable can be reasonable under the Fourth Amendment.  *Skinner [v. Ry. Labor Exec. Assn., 489 U.S. 602,] 629 n.9 [(1989)] (collecting cases)." Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 663-64 & n.3 (1995) (upholding random drug tests of athletes) *Del Raine v. Williford,* 32 F.3d 1024 (7th Cir.1994) (rejecting the "less intrusive alternative" relying on *Bell* and upholding forced rectal probe as not violative of the Eighth Amendment).

There are at least two compelling reasons why a "less intrusive alternative" is not the test. First, if courts were required to evaluate other alternatives, this would be "tantamount to federal court micro-management of a penological facility," and making a "decision to initiate different methods to search for contraband is not for this court to make . . ." *Id.* at 1042.  Under *Bell,* prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  441 U.S. at 547-48.  Second, anyone can conceive of alternatives, and "'elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" *Vernonia*, 515 U.S. at 664 n.3.  The Seventh Circuit has expressly held that the "fourth amendment does not require the use of 'less intrusive [yet] equally effective alternatives to [body] cavity inspections.'" *Sparks v. Stutler*, 71 F.3d 259, 262 (7th Cir.1995), *cert. denied*, 519 U.S. 948 (1996).  This is because

> [l]ess-restrictive-alternative arguments are too powerful: a prison always can do something, at some cost, to make prisons more habitable, but if courts assess and compare these costs and benefits then judges rather than wardens are the real prison administrators.  [*Bell v.*] *Wolfish* emphasized what is the animating theme of the Court's prison jurisprudence for the last 20 years:  the requirement that judges respect hard choices made by prison administrators."

*Phelan*, 69 F.3d at 145.  In light of the deference owed to prison administrators, the searches at issue here did not violate the Fourth Amendment, and summary judgment should have been entered in favor of defendants.

This Court misplaced on four decisions to justify the premise that "less intrusive, equally effective" alternatives can "tip the balance" in a *Bell* analysis (Op. 19).  *Campbell v. Miller*, 499 F.3d 711 (7th Cir.2007), addressed the visual anal cavity search of an individual arrested on suspicion of marijuana possession.  The strip search was conducted in the suspect's friend's backyard in full view of friends and neighbors before Campbell was issued a citation and

14

released. Because no evidence was presented to suggest "any conceivable exigency" justifying the public strip search, *Campbell* found the search was unreasonable. *Campbell* has no bearing here where the search at issue was conducted within a jail facility, and evidence was presented establishing that the method of the search was necessary to preserve security in the jail.

This Court cites *Canedy v. Boardman*, 16 F.3d 183 (7th Cir.1994), for the principle that "where it is reasonable… to respect an inmate's constitutional privacy interests, doing so… is a constitutional mandate" (Op. 19). The Seventh Circuit later clarified in *Phelan* that it is "best to understand the references to 'privacy' in *Canedy* and similar cases as invocations of the eighth amendment's ban on cruel and unusual punishments." 69 F.3d at 147; *Peckham v. Wisconsin Dept. of Corrections*, 141 F.3d 694, 697 (7th Cir.1998) ("Eighth Amendment… is more properly posed to protect inmates from unconstitutional strip searches, notably when their aim is punishment, not legitimate institutional concerns"). As no Eighth Amendment claim has been raised here, *Canedy* does not apply.

Finally, this Court relies on two trial court cases, *Calvin v. Sheriff of Will County*, 405 F.Supp.2d 933, 943 (N.D.Ill. 2005) and *Simenc v. Sheriff of DuPage County, Ill.*, No. 82 C 4778, 1985 WL 4896 (N.D.Ill. Dec. 9, 1985), as authority that strip searches "have repeatedly [been] invalidated" based on the existence of less-intrusive measures and must at minimum be conducted where the search cannot be observed by anyone other than the person conducting the search (Op. 15, 19). Reliance on *Calvin* and *Simenc*, or any trial court decision is misplaced because these decision lack precedential value. [5] *Gould v. Bowyer*, 11 F.3d 82, 84 (7th Cir.1993) ("A district court decision binds no judge in any other case, save to the extent that doctrines of preclusion (not stare decisis) apply"); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123-24 (7th Cir.1987) ("district judges . . . must not treat decisions *by other district judges*, . . . as controlling" (original emphasis)). Even if precedent, *Calvin* and *Simenc* are distinguishable (*see* Dft. SJ Reply, pp. 8-10). The decisions of federal appellate courts obviously have precedential value, and, contrary to the trial courts, they have declined to find searches unreasonable simply because not conducted privately. *Thompson v. Souza*, 111 F.3d 694 (9th Cir.1997) (strip searches in view of other inmates upheld in face of security concerns); *Elliot v. Lynn*, 38 F.3d 188 (5th Cir.1994), *cert denied*, 514 U.S. 1117 (upholding visual body cavity search in light of

---

[5] This Court's repeated reliance throughout its decision on *Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116 (N.D. Aug. 20, 1998) and other trial court decisions is misplaced for this same reason (*see, e.g.,* Op. 11, 12, 14, 15, 17.

deference owed to administrator); *Farmer v. Perrill*, 288 F.3d 1254 (10th Cir.2002) (conflicting evidence re: penological justification for collective search precluded summary judgment).

In *Farmer*, a male-to-female transsexual inmate complained about routine strip searches of inmates returning from the recreation yard to the prison's "Special Housing Unit." The inmate complained that the searches were unnecessary from a security perspective and unreasonably conducted in view of others. *Id.* at 1257. Although the location of the searches was disputed, the appellate court assumed for the sake of its decision that the searches occurred in an open area in full view of other inmates and staff. *Id.* at 1260. Defendants offered evidence of their need to conduct the searches in an open area, and plaintiff offered her own evidence attempting to call into question the justifications proffered by the defense. *Id.* at 1260-61. Plaintiff also suggested alternatives to the strip searches. In view of this disputed evidence, the court declined to decide whether the search would ultimately pass constitutional muster, as reasonable noting that the legitimacy of defendants' asserted penological need for conducting the searches in an open area presented a genuine issue of material fact not appropriate for resolution at the summary judgment stage. *Id.* at 1261.

This Court found plaintiffs' experts' credible and accepted their theories on several "less intrusive and equally effective alternatives" to current policy and practice at the jail (Op. 12-14, 18-19). Having recognized that "[d]efendants present additional arguments as to why none of these proposed alternatives are tenable" (Op. 18-19), the Court should simply have found – as in *Farmer* – that the defendants' penological justification for conducting the searches in this case presents a genuine issue of material fact precluding summary judgment. Instead, this Court engaged in impermissible fact-finding rejecting defendants' (unidentified) evidence and labeling it "unpersuasive and in some cases unsupported by the record" (Op. 19). The Court ignores the vast amount of evidence defendants presented in favor of their policy.

Defendants presented evidence from several experts that have provided extensive and authoritative reports disputing the plaintiffs' proposals for "several less intrusive and equally effective alternatives" (Ex.C ¶¶13-17). This Court rejected their credibility, found them "*unpersuasive*" and made findings of fact, which were a product of impermissible weighing of evidence (Op. 19). Credibility determinations, however, lie exclusively within the fact finder's domain and are not appropriate for a district court to make at the summary judgment stage. *Townsend v. Fuchs,* 522 F.3d 765, 774-75 (7th Cir.2008). This is particularly true here because

"the moving party's version of the facts changed over time to eventually support the non-moving party's position." *Outlaw v. Newkirk*, 259, F.3d 833, 638 (7th Cir. 2001).

Even if the plaintiffs' other feasible alternatives were the legal test, this record is replete with conflicting evidence and expert opinions (Ex.C ¶¶13-17). This evidence demonstrates that it is not feasible to separately stage male potential discharges in the RCDC before it is determined that they are an actual release due to, among other things, space, staff, and security. Males cannot be provided with the same option as females (Ex.A ¶¶15-16, 18-19; Ex.B ¶¶16, 19; Ex.C ¶¶38-56). It is a disputed fact that there is sufficient space in the RCDC to hold male court returns who return from court with a potential discharge. The evidence shows that virtually all inmate movement comes through the RCDC. It is impossible to predict the volume of movement at any one time or the space, staff, and resources required for maintenance of safety and security. Due to the physical size and layout, complexity of operations, staffing issues, and security concerns, it would be extremely difficult, if not impossible, for additional activities to be conducted in the RCDC (Ex.A ¶¶117, 122-25, 131, 133-34; Ex.B ¶134; Ex.C ¶¶71-83).

The claim that the jail has the ability to utilize other spaces besides the RCDC (such as the lockups and the Bridge area, in the CCB at 26th and California) to hold male court returns until such time as the Records Department determines whether the person is an actual discharge, is disputed. The evidence shows that approximately half of all detainees going to court on a daily basis are transported by bus to appear in the outlying courts (as this Court acknowledged (Op. 3)). There is no alternative method offered by the plaintiffs on what type of alternative process can be used to transport and separately stage male inmates with potential discharge dispositions returning from the outlying courts at the court room lockups or in the bridge cells at the CCB (Ex.C ¶34). Further, the suggestion that significant numbers of detainees can be staged by Court Services in their holding pens at the CCB does not take into account the dynamics of detainee movement into and out of the courts throughout the day. Court Services, which serves the CCB (and Bridge after 1:00 p.m. each weekday) (Ex.C ¶103)), has an entirely different mission and set of responsibilities (Ex.A ¶¶139-45; Ex.B ¶¶140-41; Ex.C ¶¶90-100).

It is disputed that the jail has the ability to identify, before court, or immediately thereafter, whether any male inmates who receive "possible discharges" have other pending cases. The evidence of record demonstrates the incapacity of the CIMIS system to accurately and efficiently process inmate data without the Records Department's manual, page-by-page review of the inmate files (Ex.B ¶¶ 10-11) Not only would the plaintiffs' proposal increase the

time required to generate court passes, but it could affect the accuracy of the data because of the timing and coordination required for batch processing of updates to separate databases. It would have a ripple effect on both the manual and automated procedures required to run the daily court call (Ex.A ¶¶70-71, 73, 75, 76, 80-89).

Contrary to this Court's fact finding, the extensive discovery that has taken place in this case shows that the jail cannot provide additional holding facilities in the RCDC by creating new bullpens to handle court discharges (Ex.A ¶¶146-49). The "commissary" and the "commissary storage areas" that are adjacent to the RCDC are not underutilized and represent an essential operational service that plaintiffs' experts and this Court ignored (Ex.A ¶¶147-49). The plaintiffs' New York expert architect admits that his proposals are only a first step in a process that does not consider all costs that might be involved, financial or otherwise (Ex.A ¶146). Plaintiffs' expert architect conceptual proposals cannot feasibly be implemented to separately stage male court returns with potential discharges, and specifically, through reconfiguration of the sanitation area, commissary and commissary storage areas, because this expert failed to take into account the full range of operational implications inherent in his proposal to achieve new holding pens for potential discharges (Ex.A ¶¶146-59; Ex.B ¶¶136-53; Ex.C ¶¶13-16).

For this Court to sort through all of these alternative proposals, weighing the costs and benefits of each option, amounts to judicial micromanaging contrary to *Bell's* directive.

## IV.   THIS COURT ERRONEOUSLY SHIFTED THE BURDEN AND IMPOSED THE DUTY TO ASCERTAIN "INDIVIDUALIZED REASONABLE SUSPICION" ON DEFENDANTS.

In granting plaintiff's motion for summary judgment on liability, this Court held: "[D]efendants have failed to establish that individual male inmates pose a greater security threat than individual female inmates. Nor have they established that they had individualized reasonable suspicion (Op.17). In so holding, this Court has improperly shifted the burden on defendants to "prove" its justification" for its actions opposing summary judgment (Op. 17). It also applied a heightened standard of scrutiny to these jail officials to show that their decisions in the method and manner of conducting male and female searches must be "substantially related" to the government's interest (Op. 11-12). And, besides improperly adopting a "less intrusive alternative" test rejected by the Supreme Court and Seventh Circuit (*see* §III, *supra*), this Court also imposed the burden on defendants that they had to have "individualized reasonable suspicion" before acting. This Court has violated binding precedent in imposing these unrecognized legal requirements and should vacate its decision.

This Court held that defendants, as the parties seeking to uphold the policy, bore the burden of establishing the constitutional validity of the policy (Op. 11-12, citing *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir.1983)). Two decades after the decision in *Mary Beth G*, the Supreme Court held that "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). And, because this was plaintiffs' motion for summary judgment, the burden remained on them to establish there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 332 (1986). This Court erred in imposing these burdens on defendants.

This Court also erred in applying a heightened standard of scrutiny to this case involving the method and manner of conducting male and female searches must be "substantially related" to the government's interest (Op. 11-12). *Bell* squarely holds that the rational relationship test applies to searches, and it upheld the same visual search at issue here as reasonably related to the government's interest in maintaining security. 441 U.S. at 558-60.

This Court imposed another burden on defendants in rejecting their "proposed justifications for conducting these searches" because defendants failed to establish the "greater security threat" or that they "had individualized reasonable suspicion" (Op. 15, n.3, 17). (It then supports its finding by stating "none of the searches of the class members resulted in detection of any weapons or drugs," again impermissibly engaging in fact- finding (*see* §II, *supra*). The Supreme Court has rejected "reasonable suspicion" as a test. A defendant's actions need not be justified by "individualized suspicion of wrongdoing, and the "Fourth Amendment imposes no irreducible requirement of such suspicion." *Vernonia*, 515 U.S. at 664 & n.3 (holding that school officials do not need reasonable suspicion in conducting random drug testing of athletes, citing *New Jersey v. T.L.O.,* 469 U.S. 325, 342 (1985), and collecting cases where the court upheld suspicionless searches and seizures); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (where officers were lawfully searching premises and had lawfully restrained plaintiff/occupant, they did not need "independent reasonable suspicion" under the Fourth Amendment to question her). To hold that officials must establish "reasonable suspicion" would make maintaining security in jails and prisons impossible, and would violate Supreme Court binding precedent in *Bell*.

## V.     DEFENDANTS WERE IMMUNE UNDER THE ELEVENTH AMENDMENT.

This Court held that defendants were not entitled to immunity holding that a visual strip search exceeded Illinois's statutory mandate to "thoroughly search" under 20 Ill.Adm.Code

§701.140(a) (Op. 21-23).  In so finding, this Court relied on the *New York* administrative code and *New York* case law instead of acknowledging defendants' argument and supporting authorities that the Illinois Administrative Code Jail Standards requires a strip search of inmates returning to their housing divisions from locations outside of the jail (*i.e.*, court appearances) (*see* Dft. SJ Reply, pp. 28-31).  The searches here are not invasive bodily searches, but visual, as approved by *Bell*.  It is impossible to conceive of a "thorough" search that could be less invasive.

Moreover, the evidence on whether the visual strip search was required was not controverted by plaintiffs' – or defendants' – experts.  They both agreed that a strip search is necessary anytime an inmate returns to a housing division following a court appearance (Ex.C ¶26), Lane's 1/28/08 pp. 2-3 report (attached as Ex.11, 11-D to Ex.A, B and attached as Ex.7A, 7D to Ex.C).  Plaintiffs failed to meet their burden showing there was a genuine issue of material fact that under *Illinois* law; a "thorough search" does not encompass the visual search of court returnees.  Because the search was mandated by state law, and defendants should have been afforded immunity under the Eleventh Amendment.  In refusing to accord defendants immunity – and, indeed, in addressing this issue in terms of "qualified immunity," a concept separate and distinct from Eleventh Amendment immunity – this Court erred.

## VI.   CONCLUSION

This Court failed to apprehend the complexity of operations at the jail and the different aspects of inmate movement throughout the facility, including movement to and from court.  To administer a correctional facility involves the management of a complex series of events and people.  Correctional administrators must balance competing interests in a very challenging physical environment.  This is especially true in the face of extraordinary challenges in the management of an ever-increasing population of inmates and detainees at the jail (Ex.C ¶23).  The facts and circumstances surrounding the processes and procedures at the largest single site jail in the United States cannot be theoretically analyzed through the use of forced logic (Ex.C ¶¶18-20).  These operations must be viewed in their proper context in order to set forth a fair and accurate picture of the realities of what takes place at the jail on a daily basis.  The Court has not done this and its decision is nothing short of judicial micromanagement of the jail.

This Court should have entered judgment for defendants based on the Fourteenth Amendment because women are not similarly situated to men given their undeniable physiological differences, the numerical differences in the two populations and available facilities.  The mere fact that women are capable of violence does not prove discriminatory intent

6350485v1  838428  51151

and defendants articulated a legitimate basis for distinguishing the two populations.  This Court also should have entered summary judgment for defendants on the Fourth Amendment because, in light of the deference owed to prison administrators, the searches at issue here were constitutional.  Moreover, defendants were immune under the Eleventh Amendment in this claim for damages.

Alternatively, a thorough review of the extensive evidence when viewed in favor of defendants conclusively demonstrates there are disputed all material facts, including the feasibility of each of the several alleged less intrusive alternatives theoretically proposed by the plaintiffs.  These are issues of fact to be decided by a jury.  This Court erred, in both its appreciation of the legal tests and in weighing the evidence, in ruling on the motion for summary judgment, and holding as a matter of law that defendants were liable.

WHEREFORE, Defendants request this Honorable Court to reconsider and vacate its Memorandum Opinion and Order of July 30, 2008 and for such other relief deemed appropriate.

Respectfully submitted,

By:  s/Steven M. Puiszis
     One of the Attorneys for Defendant,
     Michael Sheahan, Sheriff of Cook County

By:  s/Patrick Driscoll
     Assistant State's Attorney, Patrick
     Driscoll, Chief Civil Actions Bureau,
     Office of the States Attorney of Cook
     County

Steven M. Puiszis
Bernard E. Jude Quinn
Frank J. Marsico
Hinshaw & Culbertson LLP
222 N. LaSalle Street, Suite 300
Chicago, IL  60601-1081
(312) 704-3000

21

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2008, I electronically filed the above-mentioned **Motion for Reconsideration** with the Clerk of the U.S. District Court, Northern District of Illinois, Eastern Division, by using the CM/ECF system, which will send notification of such filings(s) to the following:

Thomas G. Morrissey, Esq.
Attorney at Law
10249 South Western Avenue
Chicago, IL 60643
tgmlaw@ameritech.net

Patrick M. Blanchard, Esq.
State's Attorney of Cook County
500 Richard J. Daley Center
Room 575
Chicago, IL 60602
pblanch@cookcountygov.com

Robert Farley, Jr.
1155 South Washington Street
Suite 201
Naperville, Illinois 60540
farleylaw@aol.com

By: s/Bernard E. Jude Quinn
One of its Attorneys

Steven M. Puiszis
Bernard E. Jude Quinn
Frank J. Marsico
Hinshaw & Culbertson LLP
222 N. LaSalle Street, Suite 300
Chicago, IL 60601-1081
(312) 704-3000
ARDC No.: 6284492
Email: jquinn@hinshawlaw.com