QUENTIN BULLOCK, and JACK REID,      )
individually and on behalf of a      )
class,                               )
                                     )
            Plaintiffs,              )      No. 04 C 1051
                                     )
    v.                               )
                                     )
THOMAS DART, SHERIFF OF COOK COUNTY, )
in his official capacity, and COOK   )
COUNTY,                              )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

On July 30, 2008, I entered an order resolving cross-motions
for summary judgment in this action (the "July 30 Order"). At
issue was whether defendants Michael Sheahan (then the Cook County
Sheriff) and Cook County violated the Fourth and/or Fourteenth
Amendment rights of plaintiffs Quentin Bullock, Jack Reid, and a
class of male individuals in the custody of the Cook County
Department of Corrections ("CCDOC" or the "Jail"). I granted
plaintiffs' motion for summary judgment on claims that defendants'
policy of performing blanket strip searches on male inmates
returning to CCDOC from court hearings, where those hearings
resulted in the dismissal of certain charges and there was no
additional basis for the inmates' detention, violated the Fourth
and Fourteenth Amendments. In particular, I held that defendants'
policy and practice of allowing female court returns, but not male

court returns, to avoid being subjected to a strip search by electing to remain in the Jail's receiving area while their release was processed, rather than return to their housing divisions, violated plaintiffs' right to equal protection. I also held that defendants' policy and practice of affording certain privacy accommodations to female court returns who are strip searched but not to male court returns, all of whom are strip searched, violated plaintiffs' right to equal protection. I further held that the blanket strip search policy of all male court returns violated plaintiffs' Fourth Amendment rights. I also denied defendants' motion, which sought summary judgment of non-liability on all of plaintiffs' claims, in its entirety. In particular, I held that defendants are not immune from liability under the Eleventh Amendment as a matter of law, and that a material factual dispute existed as to whether the length of plaintiffs' detention was reasonable.[1]

Now before me is defendants' motion for reconsideration of my July 30 Order. For the reasons discussed below, that motion is granted in part. To the extent the motion is granted, on reconsideration, I resolve the parties' cross-motions for summary judgment as set forth below.

---

[1]The July 30 Order stated that both sought parties summary judgment on the issue of unreasonable delay. In fact, only defendants sought summary judgment on this issue.

2

At the outset, I feel compelled to note that ascertaining which facts are genuinely in dispute in this matter has been complicated by the manner in which the parties handled their Local Rule 56.1 submissions. Instead of setting forth, and responding to, short factual statements as the Rule requires, the parties approached their filings as a platform for advancing competing characterizations of the evidence and for highlighting their respective experts' opinions. Defendants, in particular, packed multiple, often conclusory assertions and opinions into each factual "statement," followed by a string cite to various portions of the record. Plaintiffs (and I) were then faced with the burden of trying to match up the various propositions in each numbered statement with the corresponding citations and determining whether the statements were, in fact, supported by the evidence. This approach flies in the face of both the letter and the spirit of L.R. 56.1.

In addition, defendants typically responded to plaintiffs' statements with their own "undisputed" version of the same or related facts, which recharacterized, amended, or added to the facts plaintiffs set forth. This type of response is obviously unacceptable, as it fails to respond to *plaintiffs'* facts and also introduces new facts that plaintiffs have no means of controverting. If defendants cannot dispute plaintiffs' properly

supported facts, they must admit them. To the extent defendants wish to convey that plaintiffs' facts, although undisputed, fail to tell the whole story, defendants may add, in a separate numbered statement, whatever factual material they believe is necessary to complete the picture. That is the purpose of L.R. 56.1(b)(3)©. I remind both parties (for plaintiffs, while generally more restrained in their factual statements, were not immune from narrative, non-responsive, argumentative responses) that I am entitled to demand strict adherence to L.R. 56.1, and that I may refuse to consider facts presented in a fashion inconsistent with the rule. *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

With this introduction, I turn to the facts. A short glossary of terms is useful to begin. Throughout this opinion, I refer to inmates who return to the Jail after an appearance in court as "court returns." I refer to court returns whose appearance culminates in the issuance of a mittimus dismissing particular charges against them as "possible discharges." I refer to the mittimus itself as a "dismissal mittimus."[2] A possible discharge becomes an "actual discharge" if the Sheriff determines, based upon

---

[2] I note that the parties use various terms to refer to such a mittimus, including, for example, "court ordered release," and "court ordered discharge." I am mindful that a mittimus does not order or effect an inmate's release but rather dismisses certain charges against the inmate, and I have chosen the term "dismissal mittimus" to reflect this distinction.

4

a review of the inmate's records by CCDOC staff, that the inmate is not subject to any additional charges, warrants, or holds and may therefore be released.

The parties agree that as of March 2008, the Jail housed 9,165 inmates. Of these, 8,436 were male and 729 were female--a ratio of approximately nine to one. CCDOC inmates live in one of the Jail's ten housing divisions, each of which operates semi-autonomously and has its own separate building on the Jail grounds. Eight of the divisions are for men, and two are for women. Inmates are housed according to their security classifications, which are established based on a number of factors, including criminal history, prior convictions, prior disciplinary problems, known gang affiliation, any history of drug or alcohol abuse, etc. Roughly 32% of all CCDOC inmates (male and female) have a maximum security classification.

The Receiving, Classification and Diagnosis Center ("RCDC") is the Jail's hub of inmate movement. All inmates who transfer between housing divisions, or who enter or exit the Jail for any reason, including court appearances, medical or psychiatric treatment, participation in alternative programs, etc., must be processed through RCDC. In addition, the RCDC is used by CCDOC and outside agencies for various other purposes. For example, the Illinois State Department of Corrections conducts parole hearings twice a month in the male intake area of the RCDC. Inmates

5

attending these hearings are "staged" in one of the several bullpens that are also used for staging inmates before and after they attend court.

The parties do not dispute the physical characteristics of the RCDC, only the extent to which the premises are, or could be, amenable to certain activities. The parties agree on the following: An area referred to as the "male intake area" contains four small bullpens identified by letters A, B, C, and D, and six larger bullpens identified by numbers 1 through 6. The numbered bullpens are referred to as the "interior bullpens." In addition to the bullpens just described, there are five "exterior bullpens," which are located outside the male intake area.[3] Both male and female inmates who enter or leave the Jail, including for court appearances, may be staged for transit at different times in these bullpens. Defendants assert that due to security concerns, however, inmates of different security classifications and/or different discharge statuses generally are not commingled in the various bullpens.[4] Some of the bullpens described above have

---

[3]I assume that these five "exterior bullpens" are the same as those that are alternately referred to as "court return bullpens." Defendants also refer to something called the "bonding cage," also outside the intake area, and it is unclear whether this is something other than the exterior bullpens.

[4]Plaintiffs point out, and there is evidence to suggest, that certain classes of inmates are, on occasion, commingled. CCDOC's position is that although this is sometimes inevitable due to logistical constraints, it is highly undesirable from a security perspective.

6

toilet facilities while others do not. The parties disagree about how many inmates can be held in the various bullpens.

Each weekday, approximately 800 to 1,200 inmates attend court, and again the ratio of men to women is approximately nine to one. Inmates are first transported from their housing divisions to the RCDC, where they are staged in the various bullpens while CCDOC transportation officers verify and prepare the inmates' court paperwork. Roughly half of the inmates attending court on any given day attend hearings at the Criminal Courts Building ("CCB") in Chicago, which is adjacent to the CCDOC facilities and is accessed by a system of underground tunnels. Inmates whose court hearings are at one of the "outlying" courts are transported from the RCDC to the courts and back by bus. Inmates going to court at the CCB are taken through tunnels from the RCDC into the basement of the CCB, which area is known as the "Bridge." The Bridge is separated by walls into two sides known as the "male bridge," which contains holding cells numbered 4-8, and the "female bridge," which contains holding cells numbered 1-3. Confusingly, inmates of either sex may be held in the cells located on either side (but male and female inmates presumably are not commingled). The Bridge is staffed by CCDOC officers during the hours of inmate movement from the Jail to the court. Transportation officers bring inmates from the Bridge to the inmates' next waystation--the courtroom lockups--using dedicated elevators within the CCB. The lockups are

7

generally adjacent to the various courtrooms (though some or all courtrooms share lockup facilities with one other courtroom) and are staffed by courtroom deputies, who take custody of the inmates upon their arrival. At the conclusion of the morning court calls, Court Services' transportation team takes the inmates from the lockups back down to the Bridge. From there, they are returned to the Jail via the RCDC, and ultimately, in most cases, to their respective housing divisions, following a procedure that is at least as complex as the one required for their arrival at the court.

It should be apparent from the above that CCDOC has a complex system requiring interagency coordination for transporting inmates from their living quarters within the Jail to the courts and back. It is also clear from the record that the logistics of moving hundreds of inmates presenting a range of security risks to several different locations requires significant time. Indeed, inmates with court appearances are awakened between 4:00 and 4:20 a.m. to ensure their prompt arrival at court calls beginning at 9:00 or 9:30 a.m. And at the end of each day, inmates returning from outlying courts or from late court calls at the CCB may return to the RCDC as late as 9:00 p.m.

Every court return, regardless of the court's disposition of his or her case,[5] is required to return to the Jail before being released. Both male and female court returns are transported from the courts back to the RCDC. At this point, the procedure for processing court returns back into (or, in the case of actual discharges, out of) the Jail diverges based on two factors: the inmate's sex, and whether the inmate obtained a dismissal mittimus. As explained below, the combination of these factors is what determines whether and how a court return is subject to a strip search. The lack of uniformity between the procedures applied to male actual discharges and female actual discharges is the basis for plaintiffs' claims.

Before delving into these procedures, a few additional statistics provide helpful context. A representative study using data from 2002-2005 shows that on average, 209 male inmates per day receive dismissal mittimuses (i.e., they become "possible discharges"), although CCDOC physically transports only 170 of these inmates to and from court.[6] The same study showed a peak of

---

[5]For ease of reference, I sometimes refer to the disposition of a court return's "case." What I mean in each instance is the disposition of the particular charges or matter before the court on the day of the hearing.

[6]The remainder are "electronic monitoring" or "papers only" inmates, who are not physically transported from the Jail to the court and back, but who are nevertheless subject to CCDOC monitoring or are in CCDOC custody. Both numbers are relevant, since although only the inmates who are transported to and from court are subject to the challenged strip search, CCDOC must

291 possible discharges on a single day (of whom CCDOC transported 243). The corresponding numbers for female inmates show an average of 38 possible discharges per day (of whom 31 are transported), with a peak of 55 (45 transported). On average, 57% of male possible discharges became actual discharges.[7] Stated differently, an average of 43% of male court returns who receive dismissal mittimuses are not eligible for release (i.e., do not become actual discharges) due to other holds. The parties do not dispute these figures.

At all times relevant to this case, the policy and practice of CCDOC has been to strip search all male and female court returns who return to their housing divisions after a court appearance, regardless of the disposition of their cases. It has not been CCDOC's policy or practice during the relevant time period to strip search court returns, male or female, in the RCDC.

All male court returns, including those returning from court with dismissal mittimuses, are required to proceed from the RCDC to their respective housing divisions while the Records Department of the CCDOC processes their paperwork. If a male court return's mittimus indicates that he is a possible discharge, an administrative assistant in the Discharge Unit of the Records

---

process the mittimus papers of all of the inmates with court proceedings to determine whether they may be discharged.

[7]The study does not provide a corresponding percentage for female inmates.

10

Department checks CIMIS (a computerized record system containing case information on each inmate), as well as the inmate's paper "record pack" to determine whether the inmate is an actual discharge. If so, the inmate is brought back from his division to RCDC, where his identity is verified and he is released. In the case of plaintiffs Bullock and Reid, this process took eight-and-a-half and eight hours respectively.[8]

The procedure by which male court returns are searched is as follows: (1) the inmates are lined up at arm's length from each other; (2) the inmates are instructed to remove all of their clothing; (3) the inmates are then instructed to extend their arms and legs apart; and (4) the inmates are ordered to squat three or four times, and to cough while squatting. The number of inmates being searched at once varies; there is testimony that as many as 50 male inmates have been searched together, but that generally the number is lower.

---

[8]The amended complaint states, "The detention of plaintiff Bullock for approximately eight and one-half hours and plaintiff Reid for eight hours after judges determined they should be released from custody constitutes deliberate indifference to the rights of the plaintiffs." It is not clear from this language, and the parties' summary judgment papers do not clarify, whether plaintiffs began counting at the time the judge signed the dismissal mittimus, at the time plaintiffs were returned to CCDOC custody after their hearings (recall that inmates are in the custody of the courtroom deputy at least until they leave the courtroom lockups, and apparently remain in the custody of Court Services for some time thereafter en route to the Jail), at the time they actually arrived at the Jail, or some other time.

11

Female court returns are processed differently upon their return from court. Upon or shortly after their arrival at RCDC, female court returns are broken down into two groups, according to the disposition noted on their mittimuses. All female court returns other than those who received dismissal mittimuses are required, like their male counterparts, to return to their housing divisions, where they are strip searched. But female court returns whose mittimuses show they are possible discharges are segregated into a separate bullpen within the RCDC while the CCDOC staff consults CIMIS and reviews their records to determine if they are eligible for release. If these reviews show that there are no additional holds on the possible discharges, their street clothing is brought to them, and they may elect whether to return to their divisions to retrieve their personal property, in which case they are subject to a strip search, or instead to be discharged immediately and return within thirty days for their personal property.[9] The parties dispute the average time it takes for female actual discharges to be released, but there appears to be no dispute that female court returns--regardless of whether they elect to remain in the RCDC or return to the housing divisions--are

---

[9] Defendants state that roughly 90% of women entitled to immediate discharge elect to return to their divisions.

12

generally discharged in appreciably less time than the eight and eight-and-a-half hours alleged by plaintiffs Bullock and Reid.[10]

The option for female possible discharges to remain in the RCDC while their records are reviewed and their release is processed is, the parties agree, the result of an injunction issued in *Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116 (N.D. Ill., Aug. 20, 1998) (Coar, J.). During that litigation, in March of 1997, Judge Coar preliminarily enjoined the Cook County Sheriff from strip searching female possible discharges, "unless after their return a computer check of their record indicates there are other reasons for holding the inmate or unless the female court return [w]ants to return to her living quarters to recover personal items." *Id.*, Docket No. 37 (minute order). Pursuant to this injunction, which later became final, the Executive Director of the Jail issued a memorandum in 1997 setting forth the procedure described above. Around the same time, the CCDOC executive staff

---

[10]Plaintiffs allege that the process averages two hours for female actual discharges. Defendants raise several colorable objections to plaintiffs' evidence, including that it purports to be based on data produced by defendants but does not accurately reflect that data. Both parties reference the underlying data by document control number (i.e., "Bates" number), not by exhibit number, and I have been unable to locate the data in the record. Nevertheless, in their response to plaintiffs' statement of fact, defendants cite several discharge times they believe are reflected in that data, ranging from two hours and forty-five minutes to four hours and forty-five minutes. Thus, although this evidence is obviously insufficient to compare averages, even the longest female discharge time cited by defendants is considerably shorter than eight hours.

13

held at least one or two meetings to consider whether a similar policy could be instituted for male court returns but concluded it would not be feasible due to the number of male court returns and the lack of available space to segregate male possible discharges within the RCDC or elsewhere in the Jail facility.

Plaintiffs also complain that, in addition to the fact that female possible discharges may elect not to return to their divisions (and thus avoid the strip search), female court returns who do return to their divisions are strip searched in more favorable conditions than their male counterparts. In particular, while female inmates are also searched in groups, privacy screens prevent them from seeing one another. The parties agree that privacy screens were instituted for women as a result of claims brought in *Wilkes v. Sheahan*, 01 C 1592 (N.D. Ill. 2001).[11] In that case, a group of female inmates alleged that the group strip searches to which they were subjected were unsanitary and humiliating because women who were menstruating were forced to remove their sanitary napkins, causing blood to run down their legs and onto the floor, in view of other inmates.

---

[11]Plaintiffs assert that it was this lawsuit that prompted the use of privacy dividers for women. Defendants do not properly admit or deny plaintiffs' statement, but they acknowledge the lawsuit and also admit that privacy dividers are used in order to protect women from "embarrassment related to menstruation" during searches. Accordingly, I consider plaintiffs' statement undisputed.

14

Since the present lawsuit was filed, defendants have begun using privacy screens during male strip searches as well. In February 2007, the Sheriff installed privacy screens for searching male and female new inmates (or "arrestees") arriving to the Jail. Up to 37 new male inmates can be strip searched at a time with the privacy screens, and approximately 200 to 350 new male inmates are processed into the Jail on a daily basis. Also since 2007, defendants have been using privacy screens when male court returns are returned to their housing divisions and strip searched.

II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 787 (7th Cir. 2007); FED. R. CIV. P. 56©. I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

15

*Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant ]." *Anderson*, 477 U.S. at 252.

Plaintiffs seek summary judgment on the following claims:

1. The strip searching of all male court discharges and not all female court discharges violates the Equal Protection Clause.

2. The strip searching of all male court discharges in large non-private group settings with up to fifty inmates while the female court discharges, who opt to return to the housing divisions, are afforded privacy violates the Equal Protection Clause.

3. The strip searching of all male court discharges not based upon reasonable suspicion that they are concealing contraband violates the Fourth Amendment.

4. Assuming, arguendo, the Defendants are entitled to strip search all male court discharges, the manner in which the strip search is conducted, in large non-private group settings violates the Fourth Amendment.

Defendants oppose plaintiffs' motion and seek summary judgment in their favor on the grounds that 1) the strip search policy and practice applied to plaintiffs was not unreasonable; 2) plaintiffs cannot prevail on their equal protection claims; 3) plaintiffs' "unreasonable delay" in discharge claims are not actionable; and 4) defendants are immune from suit under the Eleventh Amendment.

## A. Equal Protection

The essential mandate of the Equal Protection Clause is that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)

16

(citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Although the Fourteenth Amendment "does not take from the States all power of classification," *Personnel Administrator v. Feeney*, 442 U.S. 256, 271 (1979), "a policy that expressly discriminates on the basis of gender must carry the burden of showing an 'exceedingly persuasive justification' for the differing treatment." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1274 (7th Cir. 1983) (citing *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982). In my July 30 Order, I ·held that plaintiffs had satisfied the threshold requirement of proving that male and female actual discharges are similarly situated, that there was no material dispute about defendants' intent, and that defendants had failed to show an exceedingly persuasive justification for their disparate treatment.

On reconsideration, I again conclude that male and female actual discharges are similarly situated. I am mindful that the sheer number of men versus women means that it may require more of defendants to develop a system in which male possible discharges are segregated and processed separately from other male court returns than it did for them to develop a system for segregating and processing female possible discharges separately from other female returns. I am also mindful of the physiological differences between men and women. These distinctions, however, go to whether any or all of the differences in treatment plaintiffs allege are justified, not to whether male and female actual discharges are

17

similarly situated. "The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action." *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).

The challenged action in plaintiffs' first equal protection claim is the systematic strip searching of male actual discharges, whom defendants have no authority to detain, other than for a reasonable time incident to outprocessing. Plaintiffs do not challenge defendants' policies or practices for strip searching CCDOC inmates generally, or even for strip searching court returns other than those who are to be processed out. Thus, the most salient feature of both the plaintiff class and the comparison group of female actual discharges is their discharge status, and they are similarly situated in that respect. As to plaintiffs' second claim, the challenged action is CCDOC's gender-specific use of privacy dividers. There is no question that strip searches are invasive by nature, or that regardless of one's gender, the level of invasiveness is heightened when searches are conducted in the view of others. That women menstruate may justify some level of differential treatment, but it does not alter the similarly situated inquiry. Accordingly, I again hold that plaintiffs are similarly situated to female actual discharges.

On the issue of intent, both parties appear to believe that for plaintiffs to prevail on their equal protection claim, they

18

must demonstrate discriminatory intent beyond simply pointing to a policy and practice that facially distinguishes between male and female court returns. This is understandable, since many cases invoking the Equal Protection Clause are concerned with statutes, ordinances, or other state action that is facially neutral but that disproportionately affects one group of individuals. *See, e.g.*, *Feeney*, 442 U.S. 256 (1979) (upholding facially gender-neutral veterans' preference statute that disproportionately benefitted men); *Washington v. Davis*, 426 U.S. 229 (1976) (upholding facially race-neutral employment eligibility test that adversely impacted black applicants); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (discharging from custody Chinese citizens imprisoned pursuant to facially neutral ordinance arbitrarily applied against Chinese). In such cases, because "purposeful discrimination is 'the condition that offends the Constitution.'" *Id.* at 274 (quoting *Swann v. Charlotte-Mecklenburg Board of Ed.*, 402 U.S. 1, 16 (1971)), to prevail on an equal protection claim a plaintiff must prove not only adverse impact but also invidious intent.

This, however, is not such a case. The CCDOC policy and practice of segregating female possible discharges from the remainder of the female court returns, such that female actual returns may elect to avoid strip searches, is not gender-neutral on its face. Defendants claim that their strip search policy and practice is, in fact, gender neutral because all court returns-

-male and female alike—are subject to strip searches if they return to their divisions. This simply ignores the part of the policy that excepts female actual discharges from the requirement of returning to their living quarters. There is no question that the policy adopted pursuant to the *Gary* injunction facially applies only to female court returns. In this respect, this case is not analogous to those cited above, but is more similar to *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982) (public university's policy of admitting only women to school of nursing held unconstitutional); *City of Cleburne v. Cleburne Assisted Living Center,* 473 U.S. 432 (1985) (zoning ordinance that required special use permit for group home for mentally retarded held unconstitutional); and *Mary Beth G. v. City of Chicago* 723 F.2d 1263 (7th Cir. 1983) (city's practice of strip searching female misdemeanor offenders while male misdemeanor offenders were subject only to hand searches held unconstitutional). There was no discussion, in these cases, of intent, presumably because the challenged state action discriminates on its face, and its purpose for doing so does not affect the level of scrutiny to which it is subject. *See Miss. Univ. for Women*, 458 U.S. at 725 (statutes intended to "protect" women subject to same heightened scrutiny as any policy that expressly discriminates based on gender). Likewise, plaintiffs here need not make any further showing of defendants' intent.

20

For the reasons discussed above, I again conclude that defendants must show an "exceedingly persuasive justification for the classification," that the classification serves "important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss. Univ. for Women*, 458 U.S. at 724 (internal quotations omitted). On reconsideration, I find that this is a question that must be answered by a jury.

The challenged policies cannot be analyzed in a vacuum but must be viewed in context, taking into account how they came into existence and have evolved over time. That a portion of the CCDOC inmate population must attend court each weekday is not a new phenomenon. But a significant increase in the prison population and evolving security issues have made the logistics of transporting inmates from their housing divisions to and from the various courts in Chicago and outlying districts increasingly complex.

Prior to 1992, inmates attended court in their civilian clothes, rather than in prison garb. In the event an inmate's court appearance resulted in the dismissal of the charges then before the court, Court Services would call the Records Unit at CCDOC to find out whether any additional charges, warrants, or holds prevented that inmate's release from custody. If not, the inmate was released by Court Services and was not required to

return to CCDOC at all, other than to pick up his or her personal belongings at a later time. That process changed in approximately 1992, when the inmate population of CCDOC experienced a dramatic increase. Prisoners were no longer permitted to attend court hearings in their street clothes, and for at least this reason, they were required to return to the Jail after court appearances, regardless of the court's disposition of the pending charges.

By 1996, when the *Gary* plaintiffs brought their lawsuit, CCDOC had a written policy, set forth in General Order 13.1, that required all court returns, including male and female possible discharges, to be strip searched. All court returns were also required to return to their housing divisions within the Jail, regardless of the disposition of their cases. The *Gary* plaintiffs (a class of female actual discharges) alleged that the policy was not enforced as written, and that in practice, all female court returns were subjected to systematic strip searches in the receiving area of the Jail,[12] while male court returns were not regularly strip searched at all. *See Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116 (N.D. Ill., Aug. 20, 1998) (Coar, J.).

The parties in *Gary* agreed that pursuant to General Order 13.1, female court returns were systematically strip searched in the RCDC before returning to their housing divisions. The

---

[12] I presume that the "Receiving Area" referred to in Judge Coar's opinions refers to the RCDC.

22

defendant conceded that male court returns were not strip searched in the RCDC pursuant to General Order 13.1, explaining that the number of male court returns and the limited space available had for years made strip searching male returns in the RCDC "just about impossible." *Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116 at *2 (N.D. Ill., Aug. 20, 1998). Moreover, the defendant in *Gary* presented no evidence that the Sheriff's standard practice was to strip all male inmates returning from court. The *Gary* court thus concluded that there was no dispute that female court returns were systematically strip searched, while male court returns were not. The court further found that for the purpose of the plaintiffs' claims, the male and female inmate populations were similarly situated. Accordingly, the court held, pursuant to *Mary Beth G.* and *Mississippi University for Women*, that the defendant bore the burden of showing an "exceedingly persuasive justification" for the differing treatment.

The *Gary* court went on to state:

Remarkably, the defendant does not even attempt to argue that such a policy is related to any important government objectives. Instead, the defendant tries to convince this court that there is no disparity in the treatment of the male[s] and females. The women are strip searched, the defendant contends, pursuant to the defendant's standard operating procedure that all detainees returning from court, both male and female, are to be strip searched. Although such a written policy does exist, the evidence has clearly shown that the actual practice in the Jail has not reflected this policy for nearly a decade.

23

*Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116 at *9 (N.D. Ill., Aug. 20, 1998) (citations to record omitted). The court therefore concluded that the defendant had not met its burden of justifying the differential treatment, and that there was no issue of material fact on the issue of liability under the Equal Protection Clause.

The *Gary* court also found that the defendant's practice violated the plaintiffs' Fourth Amendment rights. The court noted that even assuming female court returns posed a security risk if they returned to their housing divisions without being strip searched, "a simple change in the processing of individuals in the plaintiff class would eliminate" the need to strip search the plaintiffs, all of whom were possible discharges upon their return to the Jail and became actual discharges after a records check revealed no outstanding warrants or holds. *Gary v. Sheahan*, No. 96 C 7294, 1998 WL 547116 at *14 (N.D. Ill., Aug. 20, 1998). The court explained:

> Executive Director Velasco testified that the Sheriff has the ability to review, in a very short period of time, the six or eight females that are going to be discharged on a daily basis to make a determination whether there are other charges or holds pending. Furthermore, Assistant Director Maul testified that it is feasible to discharge females from the Receiving Room if they agreed to waive picking up their property in their cells, and instead have their property brought to them.

*Id.* (citations to record omitted).

24

Several considerations emerge from my reexamination of the *Gary* case and its relevance to plaintiffs' claims. As noted above, the parties agree that CCDOC's current policy and practice was instituted pursuant to the *Gary* court's order enjoining the Cook County Sheriff from strip searching female possible discharges, "unless after their return a computer check of their record indicates there are other reasons for holding the inmate or unless the female court return [w]ants to return to her living quarters to recover personal items." That order plainly directs the Sheriff to adopt procedures facially specific to female possible discharges, as was indeed appropriate in view of the factual record in that case.

It is clear from this history that the gender-specific policy adopted pursuant to *Gary* was instituted as a means of righting particular constitutional wrongs visited on female inmates in a particular context. It is reasonable to assume, as the *Gary* court apparently concluded, that a gender-based classification was appropriate based on the record in that case. *See Mississippi University for Women*, 458 U.S. 718 at 728 ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened"). Nevertheless, even assuming the policy adopted pursuant to the *Gary* injunction was warranted under the

25

circumstances of that case, defendants still bear the burden
of proving in *this* case, on *this* record, that the security
concerns they assert justify maintaining a facially
discriminatory policy. Their burden is high, but it is not
insurmountable. Defendants may convince a jury that the
differences between the male and female inmate populations
(for example, the substantial size difference as well as
asserted differences in the nature and frequency of dangerous
incidents in each population), justify continuing to process
male actual discharges together with the other male court
returns, despite the fact that female actual discharges are
entitled, pursuant to *Gary*, to a less intrusive practice.
Indeed, CCDOC administrators have testified that the "simple"
solution available in Gary is not feasible here due to
logistical constraints that are inseparable from security
concerns.

I conclude that the ultimate question is best framed as
whether defendants have demonstrated an exceedingly persuasive
justification for CCDOC's policy and practice of processing
male actual discharges together with the male general court
return population, while female actual discharges are
segregated and processed separately from the female court
return population. This formulation both identifies the
challenged policy in terms that affirmatively apply to the

26

plaintiff class (rather than by negative reference to the policy applied to female inmates) and makes clear that defendants bear the burden of demonstrating that the gender-based distinction is warranted under the circumstances of this case. The record contains sharply conflicting expert opinions on this question, and summary judgment is not the place to resolve this battle of the experts.

For the foregoing reasons, the parties' cross-motions for summary judgment on plaintiffs' claim that defendants' policy of strip searching of all male court discharges and not all female court discharges violates the Equal Protection Clause are denied.

Similarly, the analytical framework plaintiffs propose for their claim that plaintiffs are not offered the same level of privacy as similarly situated female court returns must be turned on its head. Plaintiffs state that "[t]he reason the Sheriff does not provide dividers for men during a strip search is because there was previously a class action lawsuit about the strip searching of women at the Jail and because there are more men than women at the Jail."[13]  The first portion of this statement is a reference to *Wilkes v. Sheahan*, 01 C 1592 (N.D. Ill. 2001), in which the plaintiffs alleged

_____

[13]Plaintiffs' Statement of Material Facts (Docket No. 280-2) No. 21.

that the group strip searches to which they were subjected were conducted in abusive, humiliating, and unsanitary conditions that violated their Fourth, Eighth and Fourteenth Amendment rights. Among other particulars, the *Wilkes* plaintiffs alleged that although they or other women being searched were menstruating, they were required to remove their sanitary napkins and perform the search in a manner that allowed blood to run down their legs onto the floor, in view of other inmates. Based on the complaint, it appears that the gravamen of the *Wilkes* plaintiffs' Fourteenth Amendment claims was that the manner in which the searches were conducted was particularly humiliating and abusive to them as women because of their particular physiological functions.

The *Wilkes* case was dismissed pursuant to a settlement agreement prior to the issuance of any opinion, so the merits of these claims was not decided. The point, however, is that the gender-based classification underlying the policy on privacy dividers, like the gender-based classification that determines who can remain in the RCDC during outprocessing, was instituted to rectify specific practices that violated (or allegedly violated, in *Wilkes*) the rights of female inmates. While neither *Wilkes* nor *Gary* is dispositive of whether defendants are justified in maintaining the gender-based distinctions challenged in this case, the factual

circumstances and claims in those cases are certainly relevant to the justifications defendants now assert. Defendants continue to bear the burden of demonstrating an exceedingly persuasive justification for the gender-based classification underlying the differential use of privacy dividers. Nevertheless, the question is properly framed not as whether *not* providing dividers to men furthers an important government interest, but rather whether providing them to women in the first instance did so.[14]

Defendants assert "the objective of protecting women from embarrassment related to menstruation" in support of their gender-based classification. Plaintiffs do not claim that this objective is unimportant, nor that the use of privacy dividers for women is insufficiently related to its achievement. Instead, plaintiffs attack defendants' justification by claiming that it "fails to appreciate that strip searches can be equally embarrassing, repulsive and degrading to males." This may be true (as noted above, this is why men and women are similarly situated), but defendant is entitled to have a jury weigh the evidence and decide whether the added factor of menstruation justifies differential treatment. As noted above, "a gender-based classification

---

[14]I assume, for the present discussion, that defendants were not independently obligated under the Fourth Amendment to use privacy dividers for either men or women.

29

favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened." *Miss. Univ. for Women*, 458 U.S. at 728. A jury could conclude, based on the evidence, that while group searches without privacy dividers are invasive and uncomfortable to both sexes, they are unreasonably so for women who may be viewed while menstruating, and that this distinction justifies CCDOC's gender-based classification.

For the foregoing reasons, the parties' cross-motions for summary judgment on plaintiffs' claim that defendants' policy of strip searching of all male court discharges in large non-private group settings with up to fifty inmates, while the female court discharges, who opt to return to the housing divisions, are afforded privacy, violates the Equal Protection Clause are denied.

### B. Fourth Amendment

On reconsideration, I have also revised my views about the appropriateness of summary judgment on plaintiffs' Fourth Amendment claims. In defendants' favor is *Bell v. Wolfish*, 441 U.S. 520 (1979), which upheld visual body cavity searches of inmates--including both sentenced prisoners and pretrial detainees--after contact visits, and which emphasized what the Seventh Circuit has called "*the* animating theme" of the Supreme Court's recent prison jurisprudence, *Johnson v.*

*Phelan*, 69 F.3d 144, 145 (7th Cir. 1995) (emphasis in
original): that prison administrators have broad discretion to
adopt and execute the policies they deem necessary to maintain
institutional security, and that judges should not interfere
with the "professional expertise of corrections officials."
441 U.S. at 548. The *Bell* court further held that body cavity
searches can be conducted on less than probable cause, *id*. at
560, and that the existence of less restrictive means of
detecting contraband does not necessarily render the searches
unreasonable. *Id*. at 559 n. 40.

Bell did not, however, approve the use of blanket strip
searches in any and all circumstances, but instead reaffirmed
the need to conduct a fact-specific inquiry into the
reasonableness of the particular search. Prison "[o]fficials
do not have *carte blanche* to institute any policy they please
under the justification of institutional security," *Calvin v.
Sheriff of Will County*, 405 F.Supp.2d 933, 942 (N.D. Ill.
2005) (citation omitted). *Bell* requires courts to consider
"the scope of the particular intrusion, the manner in which it
is conducted, the justification for initiating it, and the
place in which it is conducted." 441 U.S. at 559.

In *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th
Cir. 1983), the Seventh Circuit held that the City's policy of
routinely strip searching female misdemeanor offenders,

without reasonable suspicion that they were concealing drugs or weapons, violated the Fourth Amendment. The court acknowledged that *Bell* upheld the strip searches in that case on less than probable cause, but distinguished *Bell* on factual grounds, including that the *Bell* plaintiffs, unlike Mary Beth G., "were awaiting trial on serious federal charges...and were being searched after contact visits." 723 F.2d at 1272. The court concluded that these factual differences were "sufficiently significant to compel our own inquiry as to whether the strip searches conducted by the City were 'reasonable' under the fourth amendment." *Id.*

The court then proceeded to analyze the *Bell* factors, balancing the severe intrusion on the plaintiffs' privacy and dignity against the City's purported justification for the search. Although the City asserted "the need to maintain the security of the City lockups by preventing misdemeanor offenders from bringing in weapons or contraband," 723 F.2d at 1272, the court concluded that the City's evidence "belies its purported concerns." *Id.* at 1273. In particular, the court noted that because the plaintiffs--all of whom were detained on traffic or other minor offenses--were not charged with "the kinds of crimes...that might give rise to a reasonable belief that the woman arrestee was concealing an item in a body cavity," and that, in fact, there was no evidence that the

strip searches of female misdemeanor offenders had ever turned up contraband, the challenged searches were not justified. *Id.*

Indeed, although courts of appeals are not unanimous on the question, several circuits have agreed that minor offenders charged with non-violent crimes not ordinarily associated with drugs or weapons cannot be subject to strip searches absent a reasonable suspicion that they are harboring contraband. *See, e.g., Swain v. Spinney,* 117 F.3d 1, 7 (1st Cir. 1997); *Chapman v. Nichols,* 989 F.2d 393, 395 (10th Cir. 1993); *but see Powell v. Barrett,* No. 05-16734, 2008 WL 4072800 (11th Cir., Sept. 4, 2008) (no reasonable suspicion required). The hitch in this case, of course, is that at the time the searches are carried out on male court returns, CCDOC does not know with what crimes, if any, the inmate is charged, and, in case of the plaintiff class, the answer is--by definition--none. Here, it becomes clear that the reasonableness of plaintiffs' searches cannot be resolved as a matter of law, but depends on the jury's resolution of the same factual dispute discussed in relation to plaintiffs' Fourteenth Amendment violations. If the jury credits the testimony of plaintiffs' experts, several of whom have opined that segregating male possible discharges from the general male court return population in the RCDC would not compromise

33

institutional safety, it may conclude that CCDOC's current procedure is unreasonable. If, however, the jury credits defendants' witnesses, and determines that the Jail officials are within their discretion to execute the current procedure as necessary to institutional security, it could conclude that the searches are reasonable, notwithstanding that some of the inmates searched will ultimately be determined to have had no charges pending at the time of the search.

*Mary Beth G.* does not preclude the latter of these potential outcomes. Although the court determined in that case that the City of Chicago lacked reasonable suspicion as to female misdemeanor offenders as a class, it did not go so far as to hold that individualized reasonable suspicion as to each detainee was required, and implicitly acknowledged that reasonable suspicion may exist as to other classes of offenders (such as those charged with prostitution, assault, or narcotics violations, 723 F.2d at 1273). Accordingly, if a jury finds that security considerations prevent the segregation of actual discharges before they return to their divisions, it could also conclude that the blanket searches were reasonable, based on reasonable suspicion as to some or all of the remaining court returns.

For the foregoing reasons, the parties' cross-motions for summary judgment on plaintiffs' claim that defendants' policy

of strip searching of all male court discharges not based upon reasonable suspicion that they are concealing contraband violates the Fourth Amendment is denied.

Plaintiffs' claim that the manner in which the strip search is conducted, in large non-private group settings, violates the Fourth Amendment, is also inappropriate for summary judgment. As plaintiffs' formulation of the claim indicates, lack of privacy is their primary complaint. Plaintiffs rely on two cases for the proposition that strip searches must respect individual privacy: *Campbell v. Miller*, 499 F.3d 711 (7th Cir. 2007), and *Hills v. Bogans*, 735 F.2d 391 (10th Cir. 1984). While it is true that in each of these cases, the appeals court held that manner in which the search was conducted unreasonably invaded the arrestee's privacy, neither case supports judgment of plaintiffs' claim as a matter of law. Setting aside the fact that the plaintiff in *Campbell* was searched incident to his arrest, and not while he was in jail (the court noted that this distinction was relevant), *Campbell* addressed a visual body cavity search conducted in the arrestee's friend's backyard, in plain view of onlookers. In *Hills*, an arrestee was taken to a "lobby area" of the jail, in which ten or twelve people, none of whom was involved in the search, were milling about, then forced to face the wall and drop his pants and undershorts for a visual

inspection of his buttocks. One element that immediately distinguishes both *Campbell* and *Hill* is that the viewing public in those cases was not limited, as it is in this case, to other inmates also being searched, but included passers-by (*Campbell*) or anyone who happened to be in the jail's "lobby area" (*Hills*).

Defendants, for their part, cite to *Thompson v. Souza*, 111 F.3d 694 (9th Cir. 1997), and *Elliot v. Lynn*, 38 F.3d 188 (5th Cir. 1994), for the proposition that strip searches conducted in front of other inmates are permissible under the Fourth Amendment, and *Farmer v. Perrill*, 288 F.3d 1254 (10th Cir. 2002), for the proposition that whether legitimate penological objectives justify a strip search in an open area in view of other inmates is a fact-sensitive issue. In response to the *Farmer* defendants' argument that the lower court's denial of summary judgment erroneously placed the burden on the defendants to justify their policy (the same argument defendants raise here), the court upheld the denial, stating, "Defendants proffered evidence of their justification, the plaintiff disputed that evidence, and the district judge found that the matter could not be resolved at the summary judgment stage. That is all." 288 F.3d at 1261.

The situation in this case is similar. As defendants' cases demonstrate, the Constitution clearly does not require

36

strip searches to be conducted in a manner that allows only the prison officials conducting the search to view the inmate. Plaintiffs do not claim that a strip search conducted in a manner that allows the inmates being searched to view each other is per se unreasonable. Plaintiffs make much of the fact that in 2007, during the pendency of this lawsuit, defendants instituted the use of privacy screens for male group strip searches, and argue that this demonstrates defendants had no justification for not using them earlier. But this argument misses the point. As discussed above, prison officials are not required to choose the least restrictive means of achieving their objective of maintaining order and safety within the institution. Moreover, granting summary judgment based on CCDOC's later use of privacy screens raises a significant public policy concern. As the Eighth Circuit noted in *Klinger v. Department of Corrections*,

> [P]rison officials would be far less willing to experiment and innovate at an individual institution knowing that a federal court could impose liability on the basis of a program comparison. Indeed, inmates would suffer because officials would likely provide each institution with the bare constitutional minimum of programs and services to avoid the threat of equal protection liability.

31 F.3d 727, 733 (8th Cir. 1994). Similarly here, if each time CCDOC improved upon the conditions for conducting inmate searches, a court could impose liability based on CCDOC's pre-improvement procedures, CCDOC would have a perverse incentive

37

not to seek improvements, and to conduct searches in a manner that minimally meets constitutional standards, even where improvements are feasible. Of course, the jury may consider evidence of these improvements in weighing the parties' respective positions; but it does not entitle plaintiffs to prevail as a matter of law.

For the foregoing reasons, the parties' cross-motions for summary judgment on plaintiffs' claim that the manner in which the strip search is conducted, in large non-private group settings, violates the Fourth Amendment are denied.

As to plaintiffs' Fourth Amendment claim based on unreasonable delay, although defendants' Rule 54(b) motion for reconsideration seeks to vacate the entirety of the July 30 Order, defendants do not argue any basis for revisiting my disposition of this claim. Motions for reconsideration—regardless of whether brought under Rule 54(b) or Rule 59(e)—serve a limited function, and are appropriate only to correct manifest errors of law or fact or to present newly discovered evidence. *Rothwell Cotton Co. V. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)(quoting *Keene Corp. v. Int'l Fid. Ins. Co.*, 561 F.Supp. 656, 665-66 (N.D.Ill. 1982), *aff'd*, 736 F.2d 388 (7th Cir.1984) (citation and footnote omitted)), amended by, 835 F.2d 710 (7th Cir. 1987). As defendants have not asserted that any of these grounds applies to my denial of

summary judgment in their favor on plaintiffs' unreasonable delay claim, I decline to reconsider that denial. In any event, I am convinced that pursuant to *Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004) ("[T]he reasonableness of a length of detention typically 'is a question best left open for juries to answer based on the facts presented in each case'"), summary judgment of this claim is inappropriate in this case.

## C. Eleventh Amendment Immunity

Defendants' motion for reconsideration also asserts that I erred in declining to grant summary judgment for defendants on the basis of Eleventh Amendment immunity. They have not persuaded me, however, that my denial of summary judgment on this ground rested on a manifest error of law or fact. Defendants concede that Sheriffs generally act as county, rather than state officials. That an Illinois Sheriff *may* act as an arm of the State does not compel the conclusion that this exception--rather than the general rule--applies here. Accordingly, defendants' motion to reconsider the portion of the July 30 Order denying summary judgment on the basis of Eleventh Amendment immunity is denied.[15]

---

[15]As the substance of my analysis and the authorities I cited made clear, at issue was whether defendants are immune from suit under the Eleventh Amendment. References in the July 30 Order to "qualified" immunity should be amended accordingly.

III.

For the foregoing reasons, defendants' Rule 54(b) motion for reconsideration is granted as to the portions of the July 30 Order that granted summary judgment to plaintiffs on their Fourteenth Amendment claims and on certain of their Fourth Amendment claims. Those portions of the July 30 Order are vacated, and I now deny both parties' motions for summary judgment on those claims.

Defendants' Rule 54(b) motion is denied as to the portions of the July 30 Order denying defendant's motion for summary judgment of plaintiffs' Fourth Amendment claim of unreasonable delay and denying defendant's motion for summary judgment based on Eleventh Amendment immunity.

**ENTER ORDER:**

*Elaine E. Bucklo*

**Elaine E. Bucklo**
United States District Judge

Dated: February 27, 2009

40